FREMONT FARMERS UNION COOPERATIVE ASSOCIATION, A
NEBRASKA CORPORATION, APPELLEE, v. CITY OF FREMONT,
NEBRASKA, APPELLANT, IMPLEADED WITH THE DEPARTMENT
OF UTILITIES OF THE CITY OF FREMONT, NEBRASKA,
APPELLEE.

139 N. W. 2d 369

Filed January 14, 1966. No. 36031.

Sidner, Gunderson, Svoboda & Schilke and Max A.
Powell, for appellant.

Richards, Yost & Schafersman, for appellee Fremont
Farmers Union Coop. Assn.

Heard before WHITE, C. J., CARTER, SPENCER, BOSLAUGH,
BROWER, SMITH, and McCOWN, JJ.

SPENCER, J.

This is a negligence action. Trial was had on plain-
tiff's allegations of negligence and defendants' denial
thereof, and their allegations of contributory negligence.
The jury returned a verdict for the plaintiff and de-
fendant city has perfected an appeal to this court.

The plaintiff, Fremont Farmers Union Cooperative
Association, contracted for the construction of a feed
mill during the forepart of 1963. On February 27, 1963,
while the basement was being excavated, the contrac-
tor's caterpillar struck and ruptured a 6-inch water main

owned and maintained by the defendants, City of Fremont and Department of Utilities, who will hereinafter be referred to as defendant. The rupture occurred between 4 and 4:30 p.m. The defendant was contacted immediately and had a repair crew on the job shortly thereafter. It was necessary to shut off the water in the mains in some of the adjoining streets in the area. The water was then pumped out of the excavation by the fire department. Defendant repaired the break by removing a portion of the pipe and inserted a length of pipe and what is known as a solid sleeve connection at one end and a split sleeve connection at the other end. Defendant completed the repair between 10 and 10:30 p.m. The night was very cold and it was snowing. Representatives of the contractor, at the direction of the defendant, covered the exposed pipe and repair with corncobs to protect it from the weather. When the foundation was put in the cobs were removed and the area around the pipe was filled with packed sand, which the evidence indicated to be the usual practice. Construction was completed and the feed mill started operation June 1, 1963. On the morning of September 14, 1963, the plaintiff discovered its basement flooded. The amount of the damage sustained is not in dispute in this lawsuit. The defendant was called and the area of the previous repair was excavated. It was then determined that the trouble was in the previous repair and that the water was gushing out of the split sleeve. This split sleeve was located outside but within 3 inches of the plaintiff's basement foundation.

When the split sleeve was examined, it was discovered that of the four nuts and bolts on the north side of the sleeve three nuts were missing and the fourth bolt was broken. The defendant again repaired the water main but on this occasion used a solid rather than a split sleeve. Defendant's explanation for the change is that no split sleeve was immediately available.

Plaintiff's allegations of negligence may be stated

briefly as follows: (a) The split sleeve was an inadequate type of repair; (b) it was not adequately bolted; and (c) defendant failed to inspect and test the repairs after they were made.

The defendant denied all allegations of negligence; and alleged that the repair was made in a customary and accepted manner consonant with other water services and maintenance practices; that said repair was done in a workmanlike manner; and that it was inspected and tested after installation and found to be serviceable. Defendant further alleged that the plaintiff was contributorily negligent in constructing a feed mill in the area of the water main without reasonable regard to the possible impact damage to the water main known by the plaintiff to be in the immediate vicinity.

Defendant assigns 25 errors, many of which are repetitious and for convenience herein will be grouped. The first 13 assignments are related to its motion for a directed verdict and its motion for judgment notwithstanding the verdict, all of which is premised on the assumption that the verdict is not supported by the evidence. We do not deem it necessary to a decision herein to review in detail the four volumes of evidence or defendant's summarization thereof, which covered 44 pages of its brief. We think it sufficient to state that we have carefully read the record and defendant's review of the record, and we are of the opinion that the evidence was sufficient to require the submission of the case to the jury.

Defendant's chief complaint is its claim that the plaintiff's case is premised entirely on circumstantial evidence which is insufficient to show causation with reasonable certainty. Defendant ignores the fact that there is some direct testimony, as well as the testimony of plaintiff's expert, which testimony the jury must have accepted in preference to that of defendant's general manager and defendant's expert.

The focal point in this case is the installation of the

split sleeve. The undisputed testimony is that the bolts on the split sleeve were installed so that the nuts were underneath the installation. There was evidence from which the jury could find this to be an improper installation. Defendant's general manager, when questioned as to the proper installation of a split sleeve, testified as follows: "Q- * * * On Exhibits '1' and '2' the nut is on top of the flange, is that right? Answer, * * * 'Yes'. * * * Is that the correct installation or do you sometimes install them with the nuts underneath? * * * 'No. The nut on top is the proper installation. There is a plug on top to let the air off'."

The undisputed evidence is that on September 14, 1963, when defendant's employee uncovered the valve and reached under the north flange of the split sleeve, he turned around and said: " 'My God, there is no nuts on these bolts'." He then fished around in an attempt to find the nuts and found what appeared to be a piece of a broken nut. He also discovered that the remaining bolt had ruptured.

The February 27, 1963, repair was made in cold weather and during a snowstorm, and took from approximately 4:30 until 10:30 p.m. The two workmen who made the repair testified that each of them tightened half of the bolts. One of them testified that he later tested all of them and before he left he was satisfied there were no leaks. Some of defendant's witnesses testified they subsequently checked for leaks. Even if the jurors believed this testimony they could have found the checking was done without removing the cobs from the top of the excavation 6 feet away. Plaintiff's witnesses testified that they were on the job during working hours except for a 30-minute lunch period, and did not see any of the defendant's employees subsequently checking the repair, and that the cobs did not appear to be disturbed until they removed them.

It was the testimony of plaintiff's expert that a split sleeve, if properly installed, is a good temporary re-

pair, but in his judgment is not to be recommended as a permanent repair where there is a complete severance of the line, as was present here. This testimony is disputed by defendant's expert, who contends just as positively otherwise. Plaintiff's expert also testified that if the split sleeve had been properly installed he could not conceive of a break occurring so soon. It was his opinion that the sleeve was not properly clamped up in this instance. He drew a conclusion that because only one of the bolts broke when the break occurred, that the three others had not been properly tensed and must have loosened sometime after installation. It was his further opinion that the sleeve could have leaked some over a considerable period of time, until the remaining bolt ruptured and the break occurred. He deduced this from what he determined to be erosion marks on the sleeve. It was his positive testimony that it was not logical to believe that truck traffic could cause the break if the split sleeve had been properly installed. He also testified that if the bolts were properly tightened on both sides, he could not conceive that one of them would have fractured apart.

Defendant's expert testified the repair was a proper one and that if the nuts were not in place after the repair was made, a leak would have been evident. It was his opinion that the loss of the nuts and the rupture of the bolt were due to the vibration caused by the constant pounding of heavy trucks which passed over a gravel road within 3 feet of the waterline, which was buried 6 feet below the surface. It was his opinion this would be accelerated by the sand because there is no cushioning effect in sand when it is confined. He further testified that cast iron crystallizes when subjected to repeated stress, and that this would account for the break. It was his opinion that the plaintiff should have installed a substantial concrete apron to absorb the pounding of the trucks. In this respect it might be argued that at the time the repair was made the de-

fendant knew the nature of the construction and the use to which the waterline would be put. The repair was made entirely by the defendant and it was reimbursed for the cost thereof by the contractor.

Defendant argues that plaintiff's expert was inconsistent in many of his answers and some of his premises were unfounded as shown by defendant's evidence. Assuming defendant's premise, the answer would be that where an expert gives an opinion upon facts established by the record in a matter recognized as a proper subject for expert opinion, unless impeached to such an extent as to have no probative value, it is ordinarily sufficient to sustain a verdict. See Long v. Railway Mail Assn., 145 Neb. 623, 17 N. W. 2d 675. Under ordinary circumstances, expert opinion evidence is to be considered and weighed by the triers of the facts like any other testimony. Where expert opinion evidence is in conflict, it becomes a question for the jury. See Stolting v. Everett, 155 Neb. 292, 51 N. W. 2d 603.

Defendant's 14th assignment of error was directed to the refusal of the trial court to permit the jury to view an experiment or movies of an experiment using an identical type split sleeve with certain exceptions which were to be noted. Plaintiff objected to defendant's offer setting out specific instances in which the experiment would be dissimilar to the actual situation. There was no attempt to prove these dissimilarities did not exist, and the objection was properly sustained.

Defendant's assignments of error Nos. 15 to 24 are directed to instructions tendered and refused by the trial court, and to some of the instructions given by the court. To have given some of the instructions tendered by the defendant and refused would have been prejudicial error under the issues in this case. For instance, assignment of error No. 19 covers an instruction tendered by the defendant, providing in substance that to hold the defendant liable the city must have actual or constructive notice of the defect which caused the damage, and must

have a reasonable time after notice to make the necessary repairs. The only observation we make is that this was not an action for a structural defect in the water main. It was an action for damages caused by a repair which the plaintiff alleged to be improper in the first instance, and inadequately installed in the second. The instructions tendered by the defendant which were proper have been adequately covered in the instructions given by the trial court. Viewing the instructions of the court as a whole, we find that they adequately cover the issues involved, and adequately presented the defendant's theory of defense.

We find no merit in any of the defendant's assignments sufficient to constitute reversible error herein. We affirm the judgment of the trial court.

AFFIRMED.