STEVEN D. ZALESKI, APPELLANT, V. FARMLAND FOODS, INC., APPELLEE.

361 N.W.2d 523

Filed February 1, 1985.   No. 84-137.

Herbert J. Friedman of Friedman Law Offices, for appellant.

Knudsen, Berkheimer, Richardson & Endacott, for appellee.

KRIVOSHA, C.J., BOSLAUGH, WHITE, HASTINGS, CAPORALE, SHANAHAN, and GRANT, JJ.

SHANAHAN, J.
Steven D. Zaleski appeals an award on rehearing entered by a

three-judge panel of the Nebraska Workmen's Compensation Court. We affirm.

Zaleski, 27 years old at the time of the rehearing, had worked as a meatcutter since he was 12 years old and went to work for Farmland Foods in April 1978. Shortly after entering employment by Farmland, Zaleski became a hog "gutter," a job lasting 3 or 4 months and consuming 8 to 10 hours each workday. As a gutter, Zaleski used both hands to remove the intestine from incised hog carcasses (apparently elevated but not so indicated in the record). This process required Zaleski to grasp the hog's intestine with his left hand, pull the intestine downward away from the hog's backbone, and use his right hand to loosen the intestine for completion of evisceration with a knife. On an average Zaleski gutted 9 hogs per minute.

While working as a gutter, Zaleski experienced some back problem and transferred to "de-hide," another job with Farmland. As a dehider, Zaleski used a pneumatic knife to skin hog carcasses. Sometime during 1979, Zaleski "got tendinitis" in his right arm and transferred to "the kill floor as a head dropper," where he worked until 1982 when he experienced pain in both hands. All these jobs in varying degree involved some twisting of Zaleski's hands and rotation of arms and shoulders as he manipulated a knife in working on hog carcasses.

On account of the pain in his hands, Zaleski saw an orthopedic surgeon, Dr. Schwab, on February 8, 1982. Dr. Schwab diagnosed Zaleski's problem as a "carpal tunnel syndrome" and performed "carpal tunnel release procedures" on Zaleski's hands on August 9. After surgery for the carpal tunnels Zaleski returned to work in September 1982, but continued occasional treatment with Dr. Schwab, who was concerned about "possible systemic arthritic disease" in Zaleski's hands. At the request of Dr. Schwab a rheumatologist examined Zaleski in November and ruled out any systemic arthritic disease.

On December 1, as a result of "Adson's maneuver" performed by Dr. Schwab, there was an orthopedic diagnosis of a possible thoracic outlet syndrome involving Zaleski's left arm. Adson's maneuver consists of abduction of the arm with a

noticeable absence or disappearance of arterial pulsation as one looks toward the raised arm. A thoracic outlet syndrome is a compression of the "neurovascular bundle between the collarbone, the first rib and the muscles of the neck" and is located in the "hollow space between the collarbone and the large muscle that comes down across the back of the neck and onto the shoulder." Dr. Schwab referred Zaleski to Dr. Collicott, thoracic surgeon.

On December 15 Zaleski was examined by Dr. Collicott, who prescribed physical therapy as an alternative to the "last resort," surgery. After Zaleski failed to respond to physical therapy, Dr. Collicott performed a first rib resection on Zaleski on July 8, 1983. A first rib resection is a total removal of the first rib and division of the muscles attached to the first rib in order to enlarge "the space that the neurovascular bundle traverses." As a part of his surgical record concerning Zaleski, Dr. Collicott noted "an anomalous anterior scalene muscle." According to Dr. Collicott, an anomalous muscle was "an anatomical structure that is not normal and would have the connotation of being congenital."

After surgery on Zaleski to alleviate the thoracic syndrome, Dr. Collicott evaluated Zaleski's permanent disability as 5 percent to the body as a whole. On account of such permanent disability Zaleski was unable to return to his meatcutting job at Farmland and requested rehabilitation.

Farmland conceded that all aspects of care, treatment, and disability pertaining to Zaleski's carpal tunnels are compensable under the Nebraska Workmen's Compensation Act, but has denied compensability of any aspect of Zaleski's thoracic outlet syndrome.

As a result of the hearing before a solitary judge of the Nebraska Workmen's Compensation Court, Zaleski received an award for, among other items, permanent disability, medical expenses, and rehabilitation on account of his thoracic outlet syndrome. On rehearing, the three-judge panel of the Nebraska Workmen's Compensation Court modified the one-judge award by disallowing any recovery or rehabilitation in connection with the thoracic outlet syndrome. The three-judge panel held: "We necessarily find that the plaintiff has failed to

establish by a preponderance of the evidence that his thoracic outlet syndrome resulted from an accident arising out of and in the course of his employment."

As errors, Zaleski claims that an award in his favor should include a recovery of medical expenses for the first rib resection necessitated by the thoracic outlet syndrome, as well as an order for rehabilitation and benefits due on account of Zaleski's alleged loss of earning power.

In his deposition offered at the rehearing, Dr. Collicott acknowledged that Zaleski's anterior scalene muscle and subclavian muscle were attached in an abnormal position to Zaleski's first rib, indicative of a congenital situation, and that such muscles were being used "in a different manner than . . . was accustomed to being used in a normal individual." Dr. Collicott concluded that the congenital problem, taken with Zaleski's occupation, "certainly could contribute" to the cause of Zaleski's thoracic outlet syndrome. In addition to the anomalous condition involving muscle attachment to the rib, Dr. Collicott also noted an enlargement of the scalene muscles in Zaleski's neck. The enlarged muscle produced compression of the neurovascular bundle. In Dr. Collicott's opinion, the cause of muscle enlargement was the occupational movements of Zaleski, or, simply, Zaleski's job enlarged the scalene muscle. Dr. Collicott's testimony also included the following:

Q   Well, is the muscle large because it is congenitally large or is it large because of his occupation?

A   I cannot say.

Q   So is it true that you really can't say what caused the anomalous muscle situation in regard to Mr. Zaleski?

A   The anomalous muscle situation, that is to say, their position, was there at the time of birth.

Q   So that wouldn't have anything to do with twisting or lifting or stretching or anything?

A   No.

. . . .

Q   So is it true that you really can't say with a reasonable degree of certainty which of these two causes [anomalous attachment of muscle or enlarged muscle] is the main contributory cause to the thoracic outlet

syndrome?

A   No, not really.

Therefore, although Dr. Collicott, at one point in his testimony, expressed an opinion that Zaleski's thoracic outlet syndrome was the result of work-related enlargment of muscle, Dr. Collicott also acknowledged that he could not state whether the muscle enlargement was caused by Zaleski's occupation. In such posture Dr. Collicott's testimony contained a contradiction or conflict about the cause of the muscle enlargement as a component in Zaleski's thoracic outlet syndrome.

We have repeatedly held that where the record presents nothing more than conflicting medical testimony, this court will not substitute its judgment for that of the compensation court. See *Doty v. Aetna Life & Casualty*, 217 Neb. 428, 350 N.W.2d 7 (1984).

A conflict or contradiction regarding an expert's opinion need not result from opinions expressed by different experts. A conflict or contradiction of opinions may arise in the course of testimony given by the same expert witness. A good faith conflict due to self-contradiction of an expert's opinions presents a question to be resolved by the trier of fact. "Where the testimony of the same expert witness given at different times is conflicting, it rests with the trier of fact to resolve the conflict, at least where the conflict does not arise out of bad faith motives." *Doggett v. Brunswick Corp.*, 217 Neb. 166, 169, 347 N.W.2d 877, 880 (1984). Consequently, it was the function of the compensation court, as the trier of fact, to resolve any conflict pertaining to Dr. Collicott's opinions about causation of Zaleski's condition. The compensation court resolved the conflict by deciding that testimony from Zaleski's medical expert failed to establish causation of the claimed injury. The findings of the compensation court have the same force and effect as a jury verdict in a civil case and will not be set aside unless clearly wrong. See, Neb. Rev. Stat. § 48-185 (Reissue 1984); *Tranmer v. Mass Merchandisers*, 218 Neb. 151, 352 N.W.2d 610 (1984).

Under the circumstances the finding of the compensation court, namely, that Zaleski failed to prove a work-related cause

of his injury, is binding on this court. The award upon rehearing in the Nebraska Workmen's Compensation Court is in all respects affirmed.

AFFIRMED.