RAYMOND L. FRANK, APPELLEE, V. A & L INSULATION AND
FARMERS INSURANCE GROUP, ITS WORKERS'
COMPENSATION CARRIER, APPELLANTS.
594 N.W.2d 586

Filed May 14, 1999.   No. S-98-082.

David A. Dudley and Darin J. Lang, of Baylor, Evnen, Curtiss, Grimit & Witt, for appellants.

Samuel W. Segrist, of Meister & Segrist, for appellee.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, MCCORMACK, and MILLER-LERMAN, JJ.

HENDRY, C.J.

## PROCEDURAL HISTORY

Raymond L. Frank worked for A & L Insulation (A & L) from 1990 until August 1995. Frank claims that during this time he sustained injuries to his wrists, elbows, and shoulders due to the repetitive motions he was required to use while employed at A & L. As a result, Frank filed suit against A & L in the Nebraska Workers' Compensation Court for the injuries he allegedly sustained during the course of his employment. The compensation court determined the evidence established causation and awarded Frank $347.50 per week starting from the date of his disability, August 8. The compensation court also ordered A & L to pay for all future medical expenses relating to Frank's wrists, elbows, and shoulders. The Workers' Compensation Court review panel affirmed. A & L thereafter appealed to the Nebraska Court of Appeals and argued that Frank failed to prove his injuries were caused by or arose out of and in the course of his employment. The Court of Appeals reversed, finding no evidence of causation. *Frank v. A & L Insulation*, No. A-98-082, 1988 WL 755461 (Neb. App. Oct. 27, 1998) (not designated for permanent publication).

Frank subsequently filed a petition for further review. We granted Frank's petition for further review and now reverse the Court of Appeals' decision and remand the cause with directions.

## SUMMARY OF FACTS

Frank was 58 years old at the time of trial. After high school, Frank worked as a plumber, served in the military for a short time, then worked as a farmer until approximately 1963. From 1964 to 1972, Frank delivered beer to stores for a living. He then worked as a contractor in the building trade until 1983. From 1983 until 1990, Frank was employed doing cement work, roofing, and general carpentry. In 1990, Frank went to work for A & L, where he worked until August 8, 1995. Frank testified that when he went to work for A & L he was in good physical condition, having no problems with his wrists, elbows, or shoulders.

Frank's work for A & L involved various tasks such as installing vinyl windows, door replacements, new doors, and kitchen cabinets; putting up drywall; sanding; painting; and breaking up concrete and stucco. A large part of Frank's work required him to use his hands and arms, including prying out old windows, installing new windows, sanding and painting drywall, and using various tools such as hammers, pry bars, nail pullers, saws, and high-torque screw guns. Almost all of Frank's daily work required hammering, lifting, and using a screw gun above his head and in other awkward positions. When Frank initially worked for A & L, he installed windows ranging from 20 to 25 pounds each. However, beginning in 1993 or 1994, Frank was required to install larger and heavier windows. On some of the larger windows, Frank used a screw gun to install up to 200 2½-inch and 3½-inch screws.

In 1993, Frank went to see Thomas Rohrick, D.C., a chiropractor, complaining of generalized pain in his shoulders. Frank was first treated by Dr. Rohrick from March 3 through 29. During this period of treatment, Frank stated that he was experiencing shoulder pain in the area where the shoulders meet the neck, later explained by Dr. Rohrick as the trapezius muscle. Given the location of the pain, Dr. Rohrick ruled out any rotator cuff problems or hand or wrist injuries. Instead, Dr. Rohrick

diagnosed Frank as having brachial neuritis/radiculitis disloca-
tion (subluxation) of the cervical spine, myofibrositis and
myofascitis, and rib strain/sprain.

Dr. Rohrick also treated Frank for a lower back injury he sus-
tained while lifting a window. The injury occurred on October
7, 1994, and Frank was treated by Dr. Rohrick from October 10
through December 2. Dr. Rohrick diagnosed Frank with a dis-
location (subluxation) of the lumbar spine and spondylarthritis
and lumbar strain/sprain.

Dr. Rohrick and Frank both testified that Frank recovered
from these injuries at the conclusion of Dr. Rohrick's treatment.
The record also shows that there was no permanent impairment
or disability after the March 1993 and December 1994 treat-
ments. During both series of treatments, Frank never com-
plained of any problems with his wrists or shoulders, which
might have indicated rotator cuff tears or carpal tunnel syn-
drome, and Dr. Rohrick never diagnosed him with any such
injuries. In fact, Dr. Rohrick testified that none of Frank's com-
plaints led him to test or examine Frank for rotator cuff tears or
carpal tunnel syndrome.

Beginning in 1995, Frank noticed his right wrist was hurting.
He initially attempted to treat himself with hotpacks, and con-
tinued working. When Frank started having problems with his
right wrist, he began using his left arm to compensate for the
pain in his right hand. As a result, Frank began to feel discom-
fort in his left hand as well. A short time later, Frank also
noticed some tingling in the fingers of his right hand. The tin-
gling would come and go, but as time went on the pain became
more constant. While continuing to work, Frank also began
feeling discomfort in his right shoulder and noticing symptoms
of neck discomfort.

In the spring of 1995, Frank told his employer about these
problems. By July, the pain was so bad that Frank decided he
needed to consult a physician. On August 8, Frank consulted
Diane E. Gilles, M.D., an orthopedic surgeon. Frank com-
plained of pain in both shoulders, his left elbow, and his right
wrist. He also complained of experiencing a grinding sensation
in his neck, having trouble grasping a hammer, and starting to
drop things. After examining Frank, Dr. Gilles diagnosed him

with "degenerative joint disease of the cervical spine; impinge-ment syndrome both shoulders with possible rotator cuff tears . . . nonunion right scaphoid with post-traumatic arthritis of the wrist; carpal tunnel syndrome, right wrist and mild cubital tun-nel syndrome, left elbow." Frank has not worked since August 7.

Based on Dr. Gilles' initial diagnosis, she ordered an MRI scan of Frank's left shoulder and advised him to remain off work. The MRI showed a complete tear of the left rotator cuff, and, as such, Dr. Gilles recommended Frank undergo surgery on the left shoulder. On August 30, 1995, an MRI was performed on Frank's right shoulder, which showed a tendonopathy/partial tearing of the anterior supraspinous tendon. On August 31, Frank underwent surgery on the left rotator cuff tear and an anterior acromioplasty of the left shoulder. On November 15, Dr. Gilles performed an anterior acromioplasty of the right shoulder and repair of the right rotator cuff.

Despite surgery, Frank continued to have problems with his left shoulder. On January 30, 1996, Dr. Gilles ordered another MRI on the left shoulder, which revealed tendonopathy sub-acromial bursitis versus focal retear of the anterior supraspinous tendon. On February 23, Dr. Gilles also ordered an MRI of the cervical spine, which indicated there might be some changes occurring in the cervical spine. In order to ensure that Frank's shoulder pain was originating from the shoulders and not another area such as the neck, Dr. Gilles referred Frank to Earnest W. Beehler, M.D. Dr. Beehler found no spinal abnor-malities and therefore performed no further treatment.

On April 3, 1996, Dr. Gilles discussed with Frank the possi-bility of arthrodesis of the right wrist (wrist fusion). Dr. Gilles also recommended conducting EMG studies. The EMG studies showed clear evidence of carpal tunnel syndrome on the right hand and a mild problem with the ulnar nerve in the left elbow. On April 18, Gilles recommended a right carpal tunnel release surgery. On June 24, the results of an arthrogram of the left shoulder showed recurrent left rotator cuff tear. Gilles opined that there should be a reexploration and a rerepair of the left shoulder to ameliorate the retorn tendon.

A & L refused to pay for either the carpal tunnel release surgery or the rerepair of the left rotator cuff. Frank has yet to

receive these recommended treatments, and Dr. Gilles refuses to release Frank for work until he receives these surgeries.

## ASSIGNMENTS OF ERROR

Frank argues the Nebraska Court of Appeals erred in (1) concluding Dr. Gilles' expert opinion lacked sufficient factual foundation, (2) determining Frank failed to provide sufficient medical causation between his injuries and employment at A & L, and (3) concluding there was no evidence proving his injuries arose out of and in the course of his employment at A & L.

## STANDARD OF REVIEW

An appellate court may modify, reverse, or set aside a Workers' Compensation Court decision only when (1) the compensation court acted without or in excess of its powers; (2) the judgment, order, or award was procured by fraud; (3) there is not sufficient competent evidence in the record to warrant the making of the order, judgment, or award; or (4) the findings of fact by the compensation court do not support the order or award. *McBee v. Goodyear Tire & Rubber Co.*, 255 Neb. 903, 587 N.W.2d 687 (1999).

Upon appellate review, the findings of fact made by the trial judge of the compensation court have the effect of a jury verdict and will not be disturbed unless clearly wrong. *Crouch v. Goodyear Tire & Rubber Co.*, 255 Neb. 128, 582 N.W.2d 356 (1998). If the record contains evidence to substantiate the factual conclusions reached by the Workers' Compensation Court, an appellate court is precluded from substituting its view of the facts for that of the Workers' Compensation Court. *McBee v. Goodyear Tire & Rubber Co., supra.*

Where the record presents nothing more than conflicting medical testimony, this court will not substitute its judgment for that of the compensation court. *Zaleski v. Farmland Foods*, 219 Neb. 157, 361 N.W.2d 523 (1985). A conflict or contradiction regarding an expert's opinion need not result from opinions expressed by different experts. *Id.*

In testing the sufficiency of evidence to support findings of fact made by the Workers' Compensation Court after rehearing, the evidence must be considered in the light most favorable to

the successful party and the successful party will have the benefit of every inference reasonably deducible from the evidence. *McBee v. Goodyear Tire & Rubber Co., supra; Wilson v. Larkins & Sons*, 249 Neb. 396, 543 N.W.2d 735 (1996).

A trial court's ruling accepting or rejecting evidence will not be disturbed unless there is shown to be a clear abuse of discretion. *Duffy v. Physicians Mut. Ins. Co.*, 191 Neb. 233, 214 N.W.2d 471 (1974). Expert testimony should be stricken if it appears that the witness is not in possession of such facts as will enable him or her to express a reasonably accurate conclusion as distinguished from mere guess or conjecture. *Tank v. Peterson*, 219 Neb. 438, 363 N.W.2d 530 (1985).

## ANALYSIS

### FOUNDATION

Frank first argues the Court of Appeals erred in concluding Dr. Gilles' expert opinion lacked sufficient factual foundation.

The Court of Appeals found Dr. Gilles ill-equipped to offer an expert opinion regarding the cause of Frank's injuries because Frank never conveyed to Dr. Gilles the type of work he performed at A & L other than "general knowledge of what carpenters do." The Court of Appeals concluded that "[s]ince the evidence does not show that Frank communicated to Gilles the information he testified to about the trauma he suffered, any opinion Gilles might have given would necessarily have been based upon her general knowledge of the hard physical labor performed by carpenters."

Dr. Gilles' medical records show that Frank was a carpenter; yet the records contain no details regarding his work at A & L. In her deposition, Dr. Gilles was asked what history Frank conveyed to her on August 8, 1995. Dr. Gilles answered, "That he had worked as a carpenter for approximately a 25-year period of time . . . ." However, when later asked if she took "some additional information from [Frank] as to what his work involved as a carpenter," Dr. Gilles responded, "I think that at some point in time we later had a job description . . . that involved more detail." Dr. Gilles also stated that on February 23, 1996, "we discussed his work and the complaints of pain that he was still

having in the shoulder." Furthermore, at one point during Dr. Gilles' deposition she was asked to assume the hypothesis that Frank was required to do "a lot of hammering, a lot of work with screw drivers, a lot of work lifting, [and] a lot of work with his hands outstretched or over his arms [sic]" while employed at A & L.

We are cognizant of the rule providing that expert testimony should not be received if it appears the witness is not in possession of such facts as will enable the witness to express a reasonably accurate conclusion as distinguished from a mere guess or conjecture. See, Neb. Rev. Stat. § 27-702 (Reissue 1998); *Tank v. Peterson, supra.*

> "However, there is nothing wrong with an expert witness expressing an opinion based on facts 'perceived by or made known to him.' . . . If a hypothetical question, calling for expert skill or knowledge, is so framed as to fairly and reasonably reflect the facts proved by any of the witnesses in the case, it will be sufficient."

(Citation omitted.) *Bernadt v. Suburban Air, Inc.*, 221 Neb. 537, 541, 378 N.W.2d 852, 855 (1985) (quoting *Morris v. Laaker*, 213 Neb. 868, 331 N.W.2d 807 (1983)).

Based on our review of the record, we determine that Frank's attorney framed an appropriate hypothetical question reflecting facts proved by the record as a whole and, as such, that Dr. Gilles possessed sufficient facts to express a reasonably accurate opinion. See *Bernadt v. Suburban Air, Inc., supra.* We therefore determine the compensation court did not clearly abuse its discretion in admitting Dr. Gilles' testimony. See, *Tank v. Peterson, supra*; *Duffy v. Physicians Mut. Ins. Co., supra.*

## MEDICAL CAUSATION

Frank next argues the Court of Appeals erred in determining he failed to prove medical causation between his injuries and his employment at A & L. Frank relies exclusively on Dr. Gilles' statement in exhibit 2 in which she related his need for treatment to his work at A & L. In response, A & L contends the compensation court ignored Dr. Gilles' deposition testimony, which it alleges contradicted her statement in exhibit 2.

The Court of Appeals ruled that Dr. Gilles' testimony failed to prove medical causation between Frank's injuries and his employment at A & L. The Court of Appeals specifically relied on two statements Dr. Gilles made in her deposition. First, the court found that Dr. Gilles' statement that an additional 3 or 4 years of work "could have" caused the injuries lacked sufficient definiteness to support a workers' compensation award. Second, the court relied on Dr. Gilles' statement that Frank's injuries "are consistent with someone who has been a heavy laborer" to hold that she was unable to say whether Frank's injuries were caused by his work at A & L.

In a workers' compensation case, the plaintiff must establish by a preponderance of the evidence that the injury for which an award is sought arose out of and in the course of employment. Neb. Rev. Stat. § 48-151(2) (Reissue 1993); *Edmonds v. IBP, inc.*, 239 Neb. 899, 479 N.W.2d 754 (1992). If the nature and effect of a claimant's injury are not plainly apparent, then the claimant must provide expert medical testimony showing a causal connection between the injury and the claimed disability. *Catlin v. Prairie Marketing*, 239 Neb. 363, 476 N.W.2d 234 (1991). In *Miner v. Robertson Home Furnishing*, 239 Neb. 525, 533, 476 N.W.2d 854, 860 (1991), we held that a statement in a physician's notes was sufficient to indicate a conclusion to a reasonable degree of medical certainty when viewing the statement in the "larger context" of the physician's entire opinion. See, e.g., *Renne v. Moser*, 241 Neb. 623, 490 N.W.2d 193 (1992) (holding that expert's opinion must be examined in context of expert's entire testimony). "Although expert medical testimony need not be couched in the magic words of 'reasonable medical certainty' or 'reasonable probability,' it must be sufficient as examined in its entirety to establish the crucial causal link between the plaintiff's injuries and the defendant's negligence." *Doe v. Zedek*, 255 Neb. 963, 975, 587 N.W.2d 885, 893-94 (1999).

Dr. Gilles diagnosed Frank with numerous physical problems affecting his spine, shoulders, wrists, and elbows. As a result, Dr. Gilles performed surgery on both of Frank's shoulders and later recommended he undergo a second surgery on the left shoulder and carpal tunnel surgery on the right hand. Dr. Gilles

related the need for these treatments to Frank's work at A & L. Dr. Gilles' statement, contained in exhibit 2, provides, "In answer to your question, yes I do relate the need for the medical treatment to be related to the work he performed for A & L while working as a carpenter." Exhibit 2 was received into evidence during trial without objection.

During Dr. Gilles' deposition, she was initially asked, based on Frank's medical history, the examination and tests performed on Frank, and her education and experience, if she had an opinion, with a reasonable degree of medical certainty or probability, "whether the medical conditions you have diagnosed for Mr. Frank were caused by the work he was performing at A & L Insulation." After objection, arguments, and assertions by both attorneys, the following colloquy occurred:

Q. Did he advise you as to the length of time he had been with A & L Construction?

A. He said that he had worked as a carpenter for 25 years.

Q. But didn't say how many of those years had been with A & L?

A. I assumed that it was the whole time, but I can — I'm not 100 percent certain.

However, Frank's attorney then asked Dr. Gilles whether any of her opinions would change "if the evidence showed that he went to work for A & L in 1990 and worked for them up until 1995 . . . ." Dr. Gilles replied, "My opinions as to his problems are still the same."

Frank's attorney then asked, "And knowing he worked at A & L from 1990 up until the time you saw him in 1995, does that at all change your opinion as to the causation opinion concerning the cause of the medical condition that you've diagnosed?" After objection, arguments, and assertions by both attorneys, Frank's counsel rephrased the question and asked Dr. Gilles whether Frank could "have worked for five years in the condition he was in . . . ." After further objection and argument, Dr. Gilles stated, "I could not have worked for five years in the shape his joints were in . . . ."

Dr. Gilles then opined that Frank's "injuries are consistent with somebody who has been a heavy laborer." Frank's attorney

attempted to rephrase the question in terms of the progressive effects of being a heavy laborer. However, opposing counsel objected, stating, "I think she testified his symptoms were consistent with an individual that performed heavy labor for 25 years." Frank's attorney then asked, "Was that your opinion?" and Dr. Gilles responded, "Yes."

At this point, Frank's attorney asked Dr. Gilles a hypothetical question: If Dr. Gilles were to assume that Frank had been employed by A & L for 5 years and had been required to do a lot of hammering, working with screwdrivers, lifting, and working with his hands outstretched or "over his arms," and based upon the tests she administered in August 1995, did she have an opinion, with a reasonable degree of medical certainty or probability, for the cause of the medical condition she diagnosed? After objection, Frank's counsel expanded the hypothetical question to include the fact that Frank had been a carpenter for 25 years. When asked to give her opinion, Dr. Gilles answered:

> I think that the patient obviously related that he had had some problems a couple years before, that he did seek chiropractic treatment for his neck. The severity of those problems, I don't know. I do not have his x-rays, if any were done at that time, to compare.
>
> Even if he saw [the chiropractor] two or three years — you know, prior to that point in time but yet had been working with no complaints of pain, could an additional three or four years of work caused enough attrition on his shoulders to cause rotator cuff tears? And the answer is yes, it could have.

Frank's attorney then asked Dr. Gilles several questions regarding the timeframe of the accident. At first, Dr. Gilles conceded she was unable to pinpoint when exactly Frank sustained his injuries, stating, "Can I tell you when exactly in that 25-year period of time did his rotator cuff tears occur? The answer is, No, I can't." Dr. Gilles further stated:

> I can say that I did not specifically ask the patient how he felt in 1990, versus 1991, versus 1992. You know, I don't have a time frame and I wish I had a crystal ball to say when did your shoulder start bothering you? I don't have that exact information . . . .

However, Dr. Gilles continued:

> But I can say that it was probably unlikely that it happened 20 years ago, that it was more likely in the recent past, because of the size of the tear and the amount of pulling away of that, *that it was more likely recent than in the remote past.*

(Emphasis supplied.)

Attempting to solidify the timeframe of the injuries, Frank's attorney asked, "I think the time frame that you mentioned earlier was six months to a year. Was that what you referred to as 'recent'?" After an objection by opposing counsel, Dr. Gilles responded:

> The patient by his own history gave the history of having seen a chiropractor a couple years before. Was that his neck or shoulders at that time? I'm not sure. But obviously, he had had problems for at least two years before, but that his symptoms has [sic] gotten dramatically worse in the last six months. So in the course of 1995, the pain that he was having had gotten to the point that he sought medical treatment for it.
>
> I can't tell you how he felt in 1990 since I didn't see him in 1990. If the patient told me that he was perfectly asymptomatic and had no problems in 1990, then I can go back and say then yes, if he started employment in 1990 and didn't have problems till 1996, then I could say, Fine, it happened within that six year period of time.

Pursuant to our holding in *Miner v. Robertson Home Furnishing*, 239 Neb. 525, 476 N.W.2d 854 (1991), we are required to examine the sufficiency of Dr. Gilles' statement contained in exhibit 2 within the "larger context" of her entire opinion and the record as a whole. See, also, *Renne v. Moser*, 241 Neb. 623, 490 N.W.2d 193 (1992). In so doing, and in reviewing the compensation court's findings of fact and considering the evidence in the light most favorable to Frank, we find that the record supports the compensation court's factual findings. See, *McBee v. Goodyear Tire & Rubber Co.*, 255 Neb. 903, 587 N.W.2d 687 (1999); *Wilson v. Larkins & Sons*, 249 Neb. 396, 543 N.W.2d 735 (1996).

The Court of Appeals determined that Dr. Gilles' opinion that Frank's injuries were consistent with someone who has been a heavy laborer rendered her statement in exhibit 2 legally ineffective. However, the fact that Dr. Gilles testified that Frank's injuries were consistent with his being a heavy laborer could just as easily indicate that Frank's injuries were consistent with his work at A & L. See *Zaleski v. Farmland Foods*, 219 Neb. 157, 361 N.W.2d 523 (1985). Moreover, the fact that Dr. Gilles testified that an additional 2 to 3 years "could have" caused Frank's injuries is not dispositive when viewed in the context of the entire record. See, *Renne v. Moser, supra*; *Miner v. Robertson Home Furnishing, supra*. For example, Dr. Gilles also testified that it was "more likely" the injuries occurred in the "recent past" and that she herself could not have worked for 5 years in Frank's condition. See *Berggren v. Grand Island Accessories*, 249 Neb. 789, 545 N.W.2d 727 (1996) (holding that physician's opinion that it was "more likely" that claimant's exposure to solvents at work contributed to onset of his seizures was sufficient to establish causation required for workers' compensation award).

Dr. Rohrick's and Frank's testimony buttresses our conclusion. Dr. Gilles stated that if Frank started working at A & L in 1990 and did not have problems until 1996, "I could say, Fine, it happened within that six year period of time." Frank testified that when he went to work for A & L in 1990, he was in good physical condition, having no problems with his wrists, elbows, or shoulders. Dr. Rohrick testified that throughout his treatment of Frank, from March 1993 through December 1994, there was no indication Frank had any problems with his arms or shoulders. Frank consulted Dr. Gilles for the injuries in question on August 8, 1995. Given this record, the compensation court could find that Frank's injuries occurred in 1995. See, *McBee v. Goodyear Tire & Rubber Co., supra*; *Crouch v. Goodyear Tire & Rubber Co.*, 255 Neb. 128, 582 N.W.2d 356 (1998); *Wilson v. Larkins & Sons, supra*. The Court of Appeals' opinion supports this conclusion. The court stated:

> The record establishes that in 1993, Frank went to see Rohrick, complaining of pain in his shoulders and arms, radiating into his fingers. However, both Frank and

Rohrick testified that Frank had recovered from this pain, and therefore we will not summarize that evidence on the basis that the trial judge's finding for Frank contains an implied finding that the 1993 and 1995 [sic] complaints are not significant.

The record reveals that Dr. Gilles initially believed Frank had worked for A & L for 25 years. However, after being informed that Frank had worked for A & L for only 5 years, Dr. Gilles stated, "My opinions as to his problems are still the same." As a result, Dr. Gilles' statement in exhibit 2, in which she related Frank's need for treatments to his work at A & L, was competent evidence for consideration by the trier of fact. Dr. Gilles' statement in exhibit 2 was therefore sufficient to establish medical causation if believed by the trier of fact. See *Miner v. Robertson Home Furnishing*, 239 Neb. 525, 476 N.W.2d 854 (1991). The weight to be given to exhibit 2 was also a determination for the trier of fact. See *Fremont Farmers Union Coop. Assn. v. City of Fremont*, 179 Neb. 576, 139 N.W.2d 369 (1966) (holding that expert opinion evidence is to be considered and weighed by trier of fact). The compensation court found Dr. Gilles' testimony sufficient. We cannot say that this determination was clearly wrong. See *Crouch v. Goodyear Tire & Rubber Co., supra*.

Reviewing the entirety of Dr. Gilles' opinion and viewing the evidence in the light most favorable to Frank, we determine the Court of Appeals erred in finding that Frank failed to establish medical causation between his injuries and his employment at A & L. See, *McBee v. Goodyear Tire & Rubber Co., supra*; *Wilson v. Larkins & Sons*, 249 Neb. 396, 543 N.W.2d 735 (1996); *Renne v. Moser*, 241 Neb. 623, 490 N.W.2d 193 (1992); *Miner v. Robertson Home Furnishing, supra*. As we have repeatedly held, this court will not substitute its judgment for that of the Workers' Compensation Court where the record presents nothing more than a good faith conflict due to self-contradiction of an expert's opinion. *Zaleski v. Farmland Foods*, 219 Neb. 157, 361 N.W.2d 523 (1985). See, *Doty v. Aetna Life & Casualty*, 217 Neb. 428, 350 N.W.2d 7 (1984); *Doggett v. Brunswick Corp.*, 217 Neb. 166, 347 N.W.2d 877 (1984).

ARISING OUT OF AND IN COURSE OF EMPLOYMENT

Frank finally argues the Court of Appeals erred in concluding there was no evidence proving his injuries arose out of and in the course of his employment at A & L.

The Court of Appeals observed that the record sufficiently demonstrated that Frank's general carpentry work over the last 25 years subjected his arms, hands, and shoulders to numerous traumas each day. However, the Court of Appeals determined that "[w]hile there may be sufficient evidence of trauma, there is no evidence showing the significance of that trauma or that it was greater then [sic] the ordinary wear and tear suffered by carpenters generally." Essentially, the court concluded there was no evidence of an "accident" warranting a workers' compensation award.

Even though A & L's counsel stated during oral argument that "I suspect . . . there's enough information for [the judge] to determine that there was an accident," we will address Frank's contention given the absence of a clear indication of waiver. Compare *State v. Reichert*, 242 Neb. 33, 492 N.W.2d 874 (1992) (holding that where counsel concedes at oral argument that record does not support alleged error, error is waived).

In *Schlup v. Auburn Needleworks*, 239 Neb. 854, 860, 479 N.W.2d 440, 445 (1992), we addressed a situation similar to the case at bar, where we stated:

> "While it is . . . quite clear that a condition resulting from the cumulative effects of repeated work-related trauma has some characteristics of both an accidental injury and an occupational disease . . . the compensability of . . . a condition [resulting from the cumulative effects of repeated work-related trauma] is to be tested under the statutory definition of accident."

(Quoting *Maxson v. Michael Todd & Co.*, 238 Neb. 209, 469 N.W.2d 542 (1991).)

Under § 48-151(2), an accident is defined as "an unexpected or unforeseen injury happening suddenly and violently, with or without human fault, and producing at the time objective symptoms of an injury." See, also, *Sandel v. Packaging Co. of America*, 211 Neb. 149, 317 N.W.2d 910 (1982).

The "unexpected or unforeseen" requirement of § 48-151(2) is satisfied if either the cause was of an accidental nature or the effect was unexpected or unforeseen. See *McLaughlin v. Self-Insurance Servs.*, 219 Neb. 260, 361 N.W.2d 585 (1985). Here, there is no indication that Frank's condition was either expected or foreseeable. While he had complained of pain in the trapezius muscle for a time in 1993 and of a lower back injury in late 1994, Frank had no complaints about his wrists, elbows, or shoulders until 1995. From the evidence, the Workers' Compensation Court could properly conclude that Frank's injuries, which were diagnosed in August of 1995, were not expected or foreseen. Based on Dr. Rohrick's opinions, the court could also properly conclude that Frank's 1995 treatment was not causally connected with his complaints of 1993 and 1994.

The second specification of § 48-151(2) requires that an employee's injury must occur "suddenly and violently" to be compensable. We have held that "suddenly and violently" does not mean "instantaneously and with force." The specification "suddenly and violently" is satisfied if the injury occurs at an identifiable point in time, requiring the employee to discontinue employment and seek medical treatment. *Sandel v. Packaging Co. of America, supra.*

Frank was asked during trial, "[C]an you tell me when in 1995 you started having some physical difficulties while you were working," and Frank replied, "[I]n the spring." Frank was then asked what type of activities he was performing when he first noticed these difficulties. Frank testified he had been doing some "stucco work," which involved taking out windows and "beating [the stucco] off with a hammer." Frank testified that he first noticed his right wrist began hurting while he was performing the stucco work. Frank also testified that within a week of the initial onset his left arm, along with his right and left shoulders, began hurting. These physical difficulties ultimately became so intolerable that Frank was forced to consult Dr. Gilles on August 8, 1995. Based on these facts, we find the record sufficient to satisfy the second specification.

The third specification in § 48-151(2), that the accident produced objective symptoms, is satisfied if the symptoms mani-

fest themselves according to the natural course of such things without any independent intervening cause. *Schlup v. Auburn Needleworks, supra*; *Sandel v. Packaging Co. of America, supra.*

> " 'We are of the opinion that the expression has a wider meaning, and that symptoms of pain, and anguish, such as weakness, pallor, faintness, sickness, nausea, expressions of pain clearly involuntary, or any other symptoms indicating a deleterious change in the bodily condition may constitute objective symptoms as required by the statute.' "

*Sandel*, 211 Neb. at 157, 317 N.W.2d at 915-16.

Frank clearly manifested such symptoms when he found he could not continue to work, given the pain he was experiencing. The injuries in his upper extremities manifested themselves when his right wrist and left hand began hurting, his right-hand fingers started tingling, and his right shoulder and neck began hurting. When he consulted Dr. Gilles, he complained of pain in both shoulders, his left elbow, and his right wrist. After thoroughly examining him, Dr. Gilles diagnosed Frank with numerous problems affecting his spine, shoulders, and wrists.

We find the facts of this case sufficient to support the Workers' Compensation Court's finding that Frank suffered a work-related accident. We therefore reverse the Court of Appeals' finding that Frank's injuries did not arise out of and in the course of his employment at A & L.

## CONCLUSION

Having addressed each of Frank's assignments of error and finding each of them meritorious, we reverse the Court of Appeals' decision and remand the cause with directions to reinstate the compensation court's May 29, 1997, order.

REVERSED AND REMANDED WITH DIRECTIONS.

STEPHAN, J., dissenting.

I agree with the Court of Appeals that the evidence in this case is insufficient as a matter of law to support the award and therefore respectfully dissent. In order to recover under the Nebraska Workers' Compensation Act, a claimant has the burden of proving by a preponderance of the evidence that an accident or occupational disease arising out of or occurring in the course of his or her employment proximately caused an injury

which resulted in disability compensable under the act. *U S West Communications v. Taborski*, 253 Neb. 770, 572 N.W.2d 81 (1998); *Dyer v. Hastings Indus.*, 252 Neb. 361, 562 N.W.2d 348 (1997). While the medical evidence in this case may be construed to relate Frank's injury to his employment in general, it does not in my view establish the essential causal link between the injuries and an accident arising out of and in the course and scope of that employment, as the Nebraska Workers' Compensation Act requires.

I agree with the majority that this case presents a claim based upon the alleged cumulative effects of repeated work-related trauma and thus must be analyzed under the definition of "accident" as defined in Neb. Rev. Stat. § 48-151(2) (Reissue 1993). See, *Schlup v. Auburn Needleworks*, 239 Neb. 854, 479 N.W.2d 440 (1992); *Maxson v. Michael Todd & Co.*, 238 Neb. 209, 469 N.W.2d 542 (1991). Under our jurisprudence, the statutory requirement that a compensable accident must occur "suddenly and violently" is satisfied if injury occurs at an identifiable point in time, requiring the employee to discontinue employment and seek medical treatment. *Sandel v. Packaging Co. of America*, 211 Neb. 149, 317 N.W.2d 910 (1982). This court has stated that "specification of 'suddenly and violently' is to distinguish compensable injuries such as those in *Sandel* from chronic conditions which develop over a period of many years where the injury cannot be traced to a particular job or activity of the worker." *Schlup*, 239 Neb. at 861, 479 N.W.2d at 446. See, *Vencil v. Valmont Indus.*, 239 Neb. 31, 473 N.W.2d 409 (1991); *Maxson v. Michael Todd & Co., supra.*

The majority determines that the repetitive trauma constituting the accident in this case was the "stucco work" which Frank performed in the spring of 1995 when he first noticed symptoms of pain in his wrist and shoulders. I find this conclusion somewhat tenuous in that Frank admits that the work he did in the spring of 1995 was "pretty much the same work" he performed during 1994 and 1993. However, assuming arguendo that the majority has correctly defined the accident, I view the medical evidence as insufficient to support a reasonable inference that the accident caused Frank's injuries.

This can be seen by comparing the medical evidence in this case to that presented in two cases where we have affirmed

compensation awards based upon repetitive-trauma injuries. In *Schlup, supra*, the plaintiff, an experienced seamstress, was assigned to a task on the sewing assembly line which was different from what she had done previously. The new position required her to repetitively pull, tug, and push denim through a machine in order to attach collars, cuffs, pockets, and zippers to denim jackets and jeans. After working at this new position for less than 3 months, she developed symptoms which were diagnosed as bilateral carpal tunnel syndrome and which ultimately required surgery and prevented her from working. We held that the evidence supported a finding that the repetitive hand movements associated with the new position constituted an accident within the scope of the Nebraska Workers' Compensation Act and that causation was established by a physician's testimony, based upon reasonable medical certainty, that the plaintiff's carpal tunnel syndrome problems were caused or worsened by the repetitive heavy hand movements she was required to make in her most recent assignment.

In *Sandel, supra*, a worker in a manufacturing plant was transferred from her job as a forklift driver to that of operating a "slitter-scorer" machine used to make cardboard boxes. Upon assuming her new duties, she began experiencing symptoms of bursitis which, over a 5-month period, rendered her unable to work. A medical expert testified that in his opinion, the work done by Sandel on the slitter-scorer machine caused the bursitis, because no other job which she had held required her to constantly move and bend her wrist and arm and she did not do any kind of repetitive motion of this nature while at home. Based upon these facts, we affirmed an award of compensation.

In the present case, the medical evidence does not connect Frank's injuries with the particular job or activity which the majority deems to constitute an accident. Frank could not recall telling Dr. Gilles the specific nature of the work he performed at A & L. Dr. Gilles testified that when she first examined Frank on August 8, 1995, he stated that his symptoms had become progressively worse during the preceding 6 months, but Dr. Gilles admitted: "I don't know what activity he was doing specifically in that six months, no." The hypothetical question posed to Dr. Gilles by Frank's counsel did not focus on the

stucco work performed by Frank in the spring of 1995, but, rather, on his general duties and activities throughout his employment with A & L Insulation beginning in 1990.

At best, the medical evidence would support an inference of a general causal relationship between Frank's employment and his injuries. However, the pertinent inquiry in this case is not whether Frank's injury was caused by his *employment*, but whether it was caused by an *accident arising out of and in the course of* that employment. I can find no evidence establishing the necessary causal link between the accident identified by the majority and the injuries for which it concludes that Frank is entitled to compensation. Accordingly, I agree with the Court of Appeals that the award of the Workers' Compensation Court was based upon a clearly erroneous factual determination and should therefore be reversed with directions to dismiss.

MILLER-LERMAN, J., joins in this dissent.

CONNOLLY, J., dissenting.

I agree with the preceding dissent's "accident" analysis. However, in my opinion, it is time for this court to recognize that arbitrarily requiring the victims of work-related, repetitive-stress injuries to demonstrate an "identifiable point in time" at which the "accident" occurred is to carry on a legal charade. There is no satisfactory rationale, statutory or otherwise, for pigeonholing repetitive-stress injuries into the "accident" category and disallowing any showing that such an injury is an " 'occupational disease.' " See *Schlup v. Auburn Needleworks*, 239 Neb. 854, 869, 479 N.W.2d 440, 450 (1992) (Shanahan, J., concurring). An occupational disease is properly defined as "a condition which causes impairment, deviation, or interruption of the normal structure or function of a worker's body and which results from hazards or conditions peculiar to a particular occupation or employment." *Id.* I believe that Justice Shanahan's well-reasoned concurrence in *Schlup* was correct: A work-related, repetitive-stress injury may be compensable as an "occupational disease" under Neb. Rev. Stat. §§ 48-101 (Reissue 1998) and 48-151(3) (Reissue 1993). Therefore, I would overrule *Schlup* and *Maxson v. Michael Todd & Co.*, 238 Neb. 209, 469 N.W.2d 542 (1991), and allow the compensation

court to consider whether Frank's injuries were the result of an occupational disease. The decision of the Court of Appeals should be reversed and the cause remanded to the compensation court for a new trial in accordance with this opinion. I respectfully dissent.