GARY WEICHEL, APPELLANT, V. STORE KRAFT MANUFACTURING COMPANY AND WAUSAU INSURANCE COMPANIES, APPELLEES.

634 N.W.2d 276

Filed June 19, 2001.    No. A-00-1128.

Joy Shiffermiller and Stacy Williams, of Polsky, Cope, Shiffermiller, Coe & Monzon, for appellant.

Daniel R. Fridrich, of Law Offices of Powell & Martin, for appellees.

IRWIN, Chief Judge, and SIEVERS and CARLSON, Judges.

CARLSON, Judge.

## INTRODUCTION

Gary Weichel appeals from the decision of the Nebraska Workers' Compensation Court review panel affirming in part

and reversing in part the decision of the Nebraska Workers' Compensation Court trial judge who found that certain medical treatment was not causally related to a work injury suffered by Weichel. We affirm.

## BACKGROUND

On September 9, 1997, Weichel was employed by Store Kraft Manufacturing Company (Store Kraft) as a master craftsman. Weichel was pulling a pallet jack loaded with display cases onto a freight elevator at Store Kraft. When Weichel was in the elevator and two-thirds of the pallet jack was in the elevator, the elevator started going down. As the elevator went down, the pallet jack tipped and Weichel was forced to hold the pallet jack over his head to prevent it from falling on him. After the incident, Weichel immediately felt a tingling pain in his toes and a burning pain in his back and his arms. Weichel reported the incident to his supervisor and also talked to Store Kraft's nurse about the incident. He did not seek medical treatment because he thought the pain might go away. Although the pain did not go away, Weichel continued to work as a master craftsman doing his regular duties.

On May 5, 1998, Weichel saw a doctor for the first time in relation to his pain from the incident on September 9, 1997. Weichel was examined by Dr. Richard Blatny, his family physician. Weichel complained of numbness in the toes of both feet as well as a burning sensation in his feet. Weichel also complained of having a tingling feeling up and down his spine.

Store Kraft told Weichel that he could not use Dr. Blatny as his physician in relation to the work accident because Dr. Blatny was not in Store Kraft's managed-care system. Store Kraft's nurse made an appointment for Weichel to see Dr. David Diamant. On May 13, 1998, Weichel was examined by Dr. Diamant. Weichel complained to Dr. Diamant of constant back pain, constant numbness in his feet, a burning sensation when standing, and radicular pain going down the left thigh and calf. Dr. Diamant's impression was mechanical back pain with paresthesias in the feet. Dr. Diamant did not place any work restrictions on Weichel at this time, other than that he be allowed to participate in physical therapy.

On July 3, 1998, Weichel returned to Dr. Diamant. A CAT scan showed mild to moderate spinal stenosis. Weichel complained of numbness from the left toes to the level of the left knee and from the right toes to the level of the right ankle. Weichel was also in constant back pain. Dr. Diamant's impression was mechanical back pain with paresthesias in the feet, possibly due to lumbar spinal stenosis. Dr. Diamant suggested a steroid injection, physical therapy, medication, and a possible referral to Dr. Eric Phillips, an orthopedic surgeon, if Weichel did not improve. Dr. Diamant gave Weichel work restrictions which included no lifting greater than 25 pounds and only occasional bending and twisting of the trunk.

Weichel missed work from July 17 through 31, 1998. He saw Dr. Diamant on July 27, with complaints of constant low-back pain and cramping in the right side of the back. His legs were also tingling, the left leg worse than the right. Dr. Diamant's impression after examination was low-back pain with CAT findings suggesting spinal stenosis and paresthesias in the lower limbs possibly secondary to the spinal stenosis or possibly secondary to neuropathy. On July 31, Diamant performed electrodiagnostic studies on Weichel. Dr. Diamant referred Weichel to Dr. David Smith, a neurologist. Weichel was allowed to return to work at sedentary duty, doing "primarily seated work" and was not to lift over 10 pounds. Weichel was to remain in physical therapy and take medication. Weichel saw Dr. Smith on August 26. Dr. Smith's impression was back pain with CAT scan evidence of spinal stenosis and leg paresthesias and marginal slowed peripheral conduction times.

On September 10, 1998, Weichel returned to Dr. Diamant. He diagnosed Weichel with chronic low-back pain and peripheral neuropathy. Dr. Diamant noted that Weichel had a mild to moderate degree of spinal stenosis with possible underlying neuropathy, but did not recommend a spine surgery evaluation. Dr. Diamant believed that spine surgery "may be fraught with lack of optimal outcome." Dr. Diamant wanted Weichel to see Dr. Smith again. Weichel was to remain on light duty at work.

Weichel returned to see Dr. Diamant on October 2, 1998, with complaints of terrible pain in the back and burning and numbness in the feet. Dr. Diamant's impression was chronic low-back

pain and peripheral neuropathy. Weichel's work restrictions were to remain the same. Weichel asked for a referral to see Dr. Phillips for a surgical evaluation. Dr. Diamant cautioned Weichel that Dr. Phillips might suggest surgery and that Dr. Diamant would not recommend a surgical procedure. Dr. Diamant's notes indicate that based upon Weichel's chronic pain, he feared that Weichel might be a poor candidate for a surgical procedure, with an increased likelihood of having worsened pain and further debility as a result.

On October 26, 1998, Weichel was examined by Dr. Phillips. After examination, Dr. Phillips' impression was peripheral neuropathy, lumbar strain superimposed upon degenerative disks of the lumbar spine, and mild spinal stenosis. Dr. Phillips did not find Weichel to be a candidate for surgery. In notes from a subsequent examination of Weichel, dated December 7, 1998, Dr. Phillips stated that he did not believe he could help Weichel with surgery. Dr. Phillips stated that he was not adverse to Weichel's undergoing surgery, but he did not feel the surgery would afford Weichel the relief he was looking for. Dr. Phillips did recommend a followup with a neurosurgeon. In Dr. Phillips' notes of a telephone conversation he had with Dr. Blatny on March 15, 1999, Dr. Phillips again indicated that he could not help Weichel with surgery and that surgery would most likely make the pain worse.

Weichel returned to see Dr. Diamant on December 11, 1998. Dr. Diamant's impression of Weichel's condition remained chronic back pain, peripheral neuropathy, and spinal stenosis. Dr. Diamant's notes indicate: "With regards to what conditions are work related and which are not, certainly his back pain can be deemed work related. His peripheral neuropathy cannot." Weichel was to continue doing sedentary work, which could include lifting a maximum of 10 pounds, an occasional carrying of only small objects, and occasional walking.

Pursuant to Dr. Phillips' recommendation, on December 17, 1998, Weichel was examined by Dr. Charles Taylon, a neurosurgeon. Dr. Taylon did not recommend surgery. In a letter to Dr. Diamant, Dr. Taylon wrote:

> I explained to Mr. Weichel that I felt he probably had mechanical low back pain with a superimposed peripheral neuropathy. I explained to him that I could not tell him

with 100 percent certainty that the spinal stenosis was totally asymptomatic and not involved with his symptoms. I told him surgery to decompress the spinal stenosis had, at most, a 50-50 chance of helping him. I recommended that he return to see you [Dr. Diamant], and I told him I would write this letter.

Weichel underwent a functional capacity evaluation on January 11, 1999. The results of the functional capacity evaluation placed Weichel in a light-medium physical demand classification, which meant he could lift 35 pounds occasionally and 15 pounds or less on a frequent basis. Weichel told the physical therapist performing the evaluation that he could operate small tools on an assembly and could run a computer. Based on the functional capacity evaluation, Dr. Diamant wrote a work release note on January 18, which included permanent work restrictions. The restrictions included maximum lifting of 35 pounds occasionally and 20 pounds frequently, sitting and standing up frequently, no bending from the floor to lift anything, and walking, climbing, squatting, and kneeling occasionally. At a February 1 appointment, Dr. Diamant told Weichel that nothing further could be done for him.

In a report authored on May 4, 1999, Dr. Diamant gave a permanent impairment evaluation of Weichel. Dr. Diamant found Weichel to have reached maximum medical improvement as of February 1. He diagnosed Weichel with chronic low-back pain, peripheral neuropathy, and lumbar spinal stenosis. Dr. Diamant further found Weichel to have a 5-percent whole body impairment. Weichel's work restrictions were to remain as delineated in his functional capacity evaluation on January 11.

Weichel worked at Store Kraft until March 16, 1999. A strike occurred at Store Kraft on the evening of March 16, and Weichel chose to participate in the strike. During the strike, Weichel received pay from the union for manning the picket line. At the time of the strike, Weichel was working in the maintenance department fixing tools. Weichel worked 8 hours a day and sat on a stool or stood while he repaired tools. The human resource manager at Store Kraft testified that Weichel had been working a variety of light-duty jobs beginning in the summer of 1998. Except for the 3 or 4 weeks that Weichel worked making badges,

he was paid his regular wages for the light-duty jobs he performed. The human resource manager and Weichel's supervisor both testified that had Weichel not gone on strike, Store Kraft would have had work for Weichel to perform just as it did before the strike.

The strike lasted until May 11, 1999. Weichel was not offered a job back after the strike ended. Weichel has not worked since the start of the strike on March 16.

On May 17, 1999, upon the referral of Dr. Blatny, Weichel's original family physician, Weichel was examined by Dr. Daniel Ripa, an orthopedic surgeon. Dr. Ripa's impression was spinal stenosis, posttraumatic lumbar strain, and lumbar disk protrusion. Dr. Ripa initially suspected that Weichel could need surgery to relieve the spinal stenosis. On July 1, Dr. Ripa recommended surgery.

In a letter to Weichel's attorney, dated November 30, 1999, Dr. Ripa wrote: "Obviously stenosis is both a result of degenerative change, but also of lumbar disk bulging or protrusion, which could well have been induced by his injury." In another letter to Weichel's attorney, dated December 14, 1999, Dr. Ripa wrote: "Related to the protruding disk question, I certainly believe that the disk protrusion lead to spinal stenosis. This is a very plausible cause for spinal stenosis, which very much certainly could be related to his injury with a reasonable degree of medical certainty."

Wausau Insurance Companies, Store Kraft's workers' compensation carrier, refused to authorize the surgery recommended by Dr. Ripa. Weichel filed a motion for surgery authorization, pursuant to Neb. Rev. Stat. § 48-173 (Reissue 1998), on August 18, 1999. In support of said motion, Weichel submitted a letter by Dr. Richard Murphy to the medical case manager, dated August 5, 1999. Dr. Murphy is an orthopedic surgeon who was assigned pursuant to Store Kraft's internal dispute resolution policy to evaluate Weichel's medical records. The letter stated that after reviewing Weichel's medical records, Dr. Murphy found that the surgery recommended by Dr. Ripa was related to the work incident of September 9, 1997, and believed that the surgical recommendation of Dr. Ripa was appropriate. The trial

court overruled the motion on September 2, 1999, finding that pursuant to Neb. Rev. Stat. §§ 48-120.02(3) (Reissue 1998) and 48-134.01 (Cum. Supp. 2000), an independent medical examination should be performed. Dr. Alan Fruin, a neurosurgeon, was appointed by the trial court to act as the independent medical examiner. After reviewing Weichel's medical records, Dr. Fruin did not believe that the surgery recommended by Dr. Ripa was reasonable or necessary. He further concluded:

> Mr. Weichel's complaints of back pain are certainly related, at least historically, to the September 1997 incident. His peripheral neuropathy is in no way connected with the accident and actually his mild to moderate lumbar stenosis is not related to the accident. The lumbar stenosis is a gradual degenerative process combined with a certain amount of congenital narrowing of the spine, and the work incident in September of 1997 would have had no material effect on that stenosis.

Weichel filed a second motion for surgery authorization on December 8, 1999. Store Kraft and Wausau Insurance objected to the second motion, raising the issue of causation and stating that a trial should be had on all the issues rather than breaking up the litigation. The trial court overruled Weichel's motion finding that sustaining such motion would be premature because there had been no showing that Weichel suffered an accident and injury within the course and scope of his employment. The trial court granted Weichel leave to file a petition by January 3, 2000, stated that Store Kraft and Wausau Insurance must plead by January 14, and set February 4 as the date of trial. The surgery recommended by Dr. Ripa was performed on January 3, 2000.

At the end of the trial, the trial court found that the reason for the surgery and treatment by Dr. Ripa was not directly and proximately based on Weichel's accident and injury at work. Weichel was awarded temporary and permanent disability benefits for various periods of time, and Store Kraft and Wausau Insurance were ordered to pay certain medical bills and future medical care as required by Neb. Rev. Stat. § 48-120 (Reissue 1998). The trial court also found that Weichel was entitled to vocational rehabilitation services. Weichel appealed on several grounds,

and Store Kraft and Wausau Insurance cross-appealed, challenging the award of vocational rehabilitation. The review panel reversed the finding that Weichel was entitled to vocational rehabilitation services and affirmed the trial court's award in all other respects. Weichel appealed to this court.

## ASSIGNMENTS OF ERROR
Weichel assigns that the trial court erred in (1) assuming the role of advocate in ordering Weichel to file a petition on or before January 3, 2000, directing Store Kraft to plead by January 14, and setting trial for February 4, when it ruled on Weichel's second motion for surgery authorization; (2) failing to sustain Weichel's motion for surgery authorization; (3) failing to find, as a matter of law, that Weichel's compliance with the dispute resolution policy of Store Kraft's managed-care plan mandated approval of the surgery based on the reviewing doctor's finding that the injury and recommended surgery were related to Weichel's work-related accident; (4) failing to find that the evidence as a whole was sufficient to establish that the treatment and surgery by Dr. Ripa were directly and proximately caused by the work injury and that medical bills associated with such treatment were related to Weichel's injury; (5) failing to find that Weichel was temporarily totally disabled from March 8 through 11, 1999, and March 16, 1999, to the present; and (6) assessing Weichel's loss of earning capacity without ordering a vocational rehabilitation evaluation and finding a loss of earning capacity of only 20 percent. Weichel also assigns that the review panel erred in reversing the trial court's award of vocational rehabilitation services.

## STANDARD OF REVIEW
■ An appellate court may modify, reverse, or set aside a Workers' Compensation Court decision only when (1) the compensation court acted without or in excess of its powers; (2) the judgment, order, or award was procured by fraud; (3) there is not sufficient competent evidence in the record to warrant the making of the order, judgment, or award; or (4) the findings of fact by the compensation court do not support the order or award. *Owen v. American Hydraulics*, 258 Neb. 881, 606 N.W.2d 470 (2000).

▮ In determining whether to affirm, modify, reverse, or set aside a judgment of the Workers' Compensation Court review panel, a higher appellate court reviews the findings of the trial judge who conducted the original hearing. *Id.*

▮ Upon appellate review, the findings of fact made by the trial judge of the compensation court have the effect of a jury verdict and will not be disturbed unless clearly wrong. *Frank v. A & L Insulation*, 256 Neb. 898, 594 N.W.2d 586 (1999). If the record contains evidence to substantiate the factual conclusions reached by the Workers' Compensation Court, an appellate court is precluded from substituting its view of the facts for that of the Workers' Compensation Court. *Id.*

▮ In testing the sufficiency of evidence to support findings of fact made by the Workers' Compensation Court after rehearing, the evidence must be considered in the light most favorable to the successful party and the successful party will have the benefit of every inference reasonably deductible from the evidence. *Id.*

## ANALYSIS

### TRIAL COURT ACTING AS ADVOCATE

▮ Weichel first assigns that the trial court committed reversible error when it assumed the role of advocate in ordering Weichel to file a petition on or before January 3, 2000, directing Store Kraft and Wausau Insurance to plead by January 14, and setting trial for February 4, when it ruled on Weichel's second motion for surgery authorization. This assignment of error was never raised in the Nebraska Workers' Compensation Court. In an appeal after rehearing in the Nebraska Workers' Compensation Court, an appellate court will consider only those issues or questions properly presented and disposed of in the Nebraska Workers' Compensation Court. *Norris v. Iowa Beef Processors*, 224 Neb. 867, 402 N.W.2d 658 (1987). In the absence of plain error, when an issue is raised for the first time in an appellate court, it will be disregarded inasmuch as a lower court cannot commit error in resolving an issue never presented and submitted to it for disposition. *In re Interest of Natasha H. & Sierra H.*, 258 Neb. 131, 602 N.W.2d 439 (1999); *Lackman v. Rousselle*, 257 Neb. 87, 596 N.W.2d 15 (1999). Consequently, we do not address Weichel's first assignment of error.

### Ruling on Motion for Surgery Authorization

Weichel next assigns that the trial court erred in failing to sustain Weichel's motion for surgery authorization. Weichel does not seem to be arguing that the trial court erred in overruling Weichel's first motion for surgery authorization, wherein the court found that an independent medical examination needed to be performed.

Weichel does argue that his second motion for surgery authorization, filed December 8, 1999, should have been sustained. Weichel contends that the trial court failed to rule on the issues of the motion, that is, the reasonableness and necessity of the surgical treatment, and that the evidence at the hearing showed a causal relationship between the elevator incident at Store Kraft and Weichel's injuries requiring surgery. First, the trial court did rule on the motion. The trial court overruled the motion finding that it could not grant surgery authorization when there had been no finding that Weichel had suffered an injury within the course and scope of his employment. Second, even if the evidence did show a causal relationship between the elevator incident and Weichel's injuries requiring surgery, there is no statutory authority for a trial court to summarily award surgery when the plaintiff has not yet proved causation, which was an issue in this case. The trial court told the parties at the hearing on the motion that if it was to sustain the motion and Store Kraft appealed the decision, the case would be sent back to the trial court to make a finding as to whether there was an accident arising out of and in the course of Weichel's employment with Store Kraft. Weichel's counsel did not object to the trial court's reasoning and indicated that she agreed. Weichel was then granted leave to file a petition to bring all the necessary issues before the court. Weichel's alleged error is without merit.

### Compliance With Dispute Resolution Policy

Weichel's third assignment is that the trial court erred when it failed to find, as a matter of law, that Weichel's compliance with the dispute resolution policy of Store Kraft's managed-care plan mandated approval of the surgery. Weichel contends that the surgery should have been approved because Dr. Murphy, the doctor appointed in accordance with the internal dispute resolution policy, found the surgery to be related to Weichel's work accident.

Store Kraft has a managed-care plan under § 48-120.02. Section 48-120.02(3) requires that "[a]n employee shall exhaust the dispute resolution procedure of the certified managed care plan prior to filing a petition or otherwise seeking relief from the compensation court on an issue related to managed care." Weichel claims to have exhausted the dispute resolution policy of Store Kraft's managed-care plan. Pursuant to Store Kraft's internal dispute resolution policy, Dr. Murphy was appointed to conduct a review of Weichel's medical records and make a recommendation as to future treatment. After reviewing Dr. Ripa's surgical recommendation and Weichel's medical history, Dr. Murphy found that Dr. Ripa's recommendations were appropriate and that the recommended surgery was related to the work accident on September 9, 1997. Weichel contends that pursuant to the dispute resolution policy, Store Kraft is bound by the findings of Dr. Murphy, and as such, the surgery should have been approved. Weichel misinterprets Store Kraft's internal dispute resolution policy. There is no portion of the dispute resolution policy that makes Dr. Murphy's determinations binding upon the parties, nor is there any part of the policy that requires Store Kraft to proceed with the proposed resolution. The internal dispute policy, which is in the record, consists of a graph that outlines the process. The last step of the policy states: "Party may submit dispute to the Nebraska Workers Compensation Court." This makes it clear that a recommendation for treatment made pursuant to the internal dispute policy is not binding on either party. If the doctor appointed to review an employee's medical records gives a favorable determination to the employee and the employer chooses to not approve the doctor's recommendation, the employee can bring the dispute to the Workers' Compensation Court. When a dispute is brought to the Workers' Compensation Court, it is up to the court to decide the dispute in a manner that is binding on both parties. Weichel's argument is without merit.

### Dr. Ripa's Treatment and Surgery Directly and Proximately Caused by Work Injury

Weichel's fourth assignment is that the trial court erred in failing to find that the evidence as a whole was sufficient to establish that the treatment and surgery by Dr. Ripa were

directly and proximately caused by the work injury and that medical bills associated with such treatment were related to Weichel's injury. The trial court found that Dr. Ripa's opinion that the spinal stenosis and the surgery could have been based upon the injury at work was not sufficient to justify an award.

Upon appellate review, the findings of fact made by the trial judge of the compensation court have the effect of a jury verdict and will not be disturbed unless clearly wrong. *Frank v. A & L Insulation*, 256 Neb. 898, 594 N.W.2d 586 (1999). If the record contains evidence to substantiate the factual conclusions reached by the Workers' Compensation Court, an appellate court is precluded from substituting its view of the facts for that of the Workers' Compensation Court. *Id.*

The surgery performed by Dr. Ripa was done to help relieve the spinal stenosis. The evidence contains the findings of four doctors with regard to whether Weichel's spinal stenosis was related to the injury at work on September 9, 1997. Dr. Taylon testified by deposition that spinal stenosis is a degenerative condition associated with aging and wear and tear, and is a process that occurs over a period of time. Dr. Fruin concluded that Weichel's spinal stenosis was not related to his work accident. Specifically, he found, "The lumbar stenosis is a gradual degenerative process combined with a certain amount of congenital narrowing of the spine, and the work incident in September of 1997 would have had no material effect on that stenosis." In his deposition testimony, Dr. Fruin also stated that spinal stenosis is a gradual degenerative process and that it is not a problem that develops acutely, but, rather, takes a lifetime to develop. Dr. Ripa came to the conclusion that the spinal stenosis and the surgery could have been based upon the injury at work. In a letter to Weichel's attorney, Dr. Ripa wrote: "Obviously stenosis is both a result of degenerative change, but also of lumbar disk bulging or protrusion, which could well have been induced by his injury." In another letter to Weichel's attorney, Dr. Ripa wrote: "Related to the protruding disk question, I certainly believe that the disk protrusion lead to spinal stenosis. This is a very plausible cause for spinal stenosis, which very much certainly could be related to his injury with a reasonable degree of medical certainty." Dr. Murphy believed that the surgery was related to the work incident.

The trial court was forced to choose between conflicting medical evidence. If the record in a workers' compensation case presents conflicting medical reports and testimony, an appellate court will not substitute its judgment for that of the compensation court regarding which medical evidence to rely upon. *Kerkman v. Weidner Williams Roofing Co.*, 250 Neb. 70, 547 N.W.2d 152 (1996); *Paulsen v. State*, 249 Neb. 112, 541 N.W.2d 636 (1996). As the sole trier of fact, the compensation court is the sole judge of the credibility of the medical evidence and the weight to be given to it. See *Kerkman v. Weidner Williams Roofing Co., supra.*

The trial court was not clearly wrong in finding that the treatment and surgery by Dr. Ripa are not directly and proximately caused by the work injury on September 9, 1997. The record contains evidence to substantiate the trial court's finding. Therefore, the medical bills associated with the treatment and surgery by Dr. Ripa are not recoverable.

### TEMPORARY TOTAL DISABILITY

Weichel's fifth assignment of error is that the trial court erred in failing to find Weichel temporarily totally disabled from March 8 to 11, 1999, and from March 16, 1999, to the present. When a worker has reached maximum recovery, the remaining disability is permanent and such worker is no longer entitled to compensation for temporary disability. *Gardner v. Beatrice Foods Co.*, 231 Neb. 464, 436 N.W.2d 542 (1989); *Kleiva v. Paradise Landscapes*, 227 Neb. 80, 416 N.W.2d 21 (1987). Under current law, a workers' compensation claimant cannot receive temporary total disability benefits upon reaching maximum medical improvement. *Gibson v. Kurt Mfg.*, 255 Neb. 255, 583 N.W.2d 767 (1998). An exception applies when a plaintiff is awarded rehabilitation benefits. See, *Gardner v. Beatrice Foods Co., supra*; Neb. Rev. Stat. §§ 48-121(5) (Cum. Supp. 2000) and 48-162.01 (Reissue 1998).

Dr. Diamant found that Weichel reached maximum medical improvement on February 1, 1999, and that Weichel suffered a 5-percent permanent partial impairment to the whole person. Whether an employee has reached maximum medical improvement or recovery is a question of fact to be determined

by the compensation court. *Heiliger v. Walters & Heiliger Electric, Inc.*, 236 Neb. 459, 461 N.W.2d 565 (1990). The trial court relied on Dr. Diamant's findings.

Upon appellate review, the findings of fact made by the trial judge of the compensation court have the effect of a jury verdict and will not be disturbed unless clearly wrong. *Frank v. A & L Insulation*, 256 Neb. 898, 594 N.W.2d 586 (1999). If the record contains evidence to substantiate the factual conclusions reached by the Workers' Compensation Court, an appellate court is precluded from substituting its view of the facts for that of the Workers' Compensation Court. *Id.*

There is sufficient expert medical evidence that Weichel reached maximum medical improvement prior to the dates in question. The trial court was required to terminate temporary total disability benefits upon the attainment of maximum medical improvement, which is what it did in this case. Weichel's assignment of error is without merit.

### LOSS OF EARNING CAPACITY

Weichel's sixth assignment of error is that the trial court erred in assessing Weichel's loss of earning capacity without ordering a vocational rehabilitation evaluation and in finding a loss of earning capacity of only 20 percent. Weichel's brief does not contain any argument regarding the trial court's not ordering a vocational rehabilitation evaluation. Errors assigned but not argued will not be addressed. *Harris v. Harris*, 261 Neb. 75, 621 N.W.2d 491 (2001). Accordingly, we do not address this part of Weichel's assigned error.

As to the trial court's finding of a 20-percent loss of earning capacity, upon a determination that an employee has reached maximum medical improvement, absent a valid reason for not making such a determination, the trial court is obligated to make a determination as to the employee's loss of earning power. *Gibson v. Kurt Mfg., supra.* A determination as to whether an injured worker has had a loss of earning power is a question of fact to be determined by the Workers' Compensation Court. *Cords v. City of Lincoln*, 249 Neb. 748, 545 N.W.2d 112 (1996); *McGowan v. Lockwood Corp.*, 245 Neb. 138, 511 N.W.2d 118 (1994).

█ Section 48-121(2) states in pertinent part: "For disability partial in character . . . the compensation shall be sixty-six and two-thirds percent of the difference between the wages received at the time of the injury and the earning power of the employee thereafter." "Earning power," as used in subsection (2) of § 48-121, is not synonymous with wages, but includes eligibility to procure employment generally, ability to hold a job obtained, and capacity to perform the tasks of the work, as well as the ability of the worker to earn wages in the employment in which the worker is engaged or for which he or she is fitted. *Sidel v. Travelers Ins. Co.*, 205 Neb. 541, 288 N.W.2d 482 (1980).

The trial court based its finding of 20-percent loss of earning power upon the permanent work restrictions set for Weichel by Dr. Diamant and after considering the factors for determining "earning power" as set forth in *Sidel v. Travelers Ins. Co., supra.* Dr. Diamant issued permanent work restrictions for Weichel on January 18, 1999. The restrictions included maximum lifting of 35 pounds occasionally and 20 pounds frequently and no bending from the floor to lift anything, and he could walk, climb, squat, and kneel occasionally. Weichel was working within these restrictions at Store Kraft until March 16, 1999, when he went on strike. Before he went on strike, he was making the same wage that he had made prior to the work accident.

Assessing a loss of earning capacity is a factual finding that cannot be disturbed on appeal unless it is clearly wrong. *Frank v. A & L Insulation*, 256 Neb. 898, 594 N.W.2d 586 (1999). We are precluded from substituting our view of the facts for that of the Workers' Compensation Court if the record contains evidence to substantiate the factual conclusions reached by the court. *Id.* We conclude that there is sufficient competent evidence in the record justifying the trial court's finding of a loss of earning capacity of 20 percent. Therefore, the trial court was not clearly wrong.

### VOCATIONAL REHABILITATION SERVICES

Weichel's final assignment is that the review panel erred in reversing the trial court's award of vocational rehabilitation services. Section 48-162.01(3) states in part:

> An employee who has suffered an injury covered by the Nebraska Workers' Compensation Act shall be entitled to

> prompt medical and physical rehabilitation services. When as a result of the injury an employee is unable to perform suitable work for which he or she has previous training or experience, he or she shall be entitled to such vocational rehabilitation services, including job placement and retraining, as may be reasonably necessary to restore him or her to suitable employment.

The trial court found that Weichel, at the time of trial, was unable to engage in any substantial gainful employment and that therefore, Weichel was in need of vocational rehabilitation services. However, trial was held just 1 month after Weichel had his back surgery. The evidence shows that Weichel continued to work after the September 9, 1997, work accident until May 1998 without missing a day of work and without seeking medical treatment. Weichel continued to work at Store Kraft on light duty, working a variety of jobs from the summer of 1998 until March 16, 1999. Weichel was working at the time he reached maximum medical improvement and continued to do so until he left his job on March 16, 1999, to go on strike. At the time of the strike, Weichel was earning his preinjury wage. There is nothing in the record to indicate that had Weichel not gone on strike, he could not have continued to work.

It was not until after Weichel had surgery in January 2000 that he was unable to work within his restrictions. The surgery was performed to relieve the spinal stenosis, which the trial court found to be a non-work-related condition. The evidence shows that Weichel was not entitled to an award of vocational rehabilitation because Weichel's inability to work at the time of trial was not a result of a work-related injury, but of the unrelated surgery for the spinal stenosis. The evidence shows that Weichel was able to be employed at Store Kraft at his preinjury wage until going on strike on March 16, 1999. Therefore, even though Weichel was unable to engage in any substantial gainful employment at the time of trial, it was not because of a compensable work-related accident. The cause of his inability to work at the time of trial was his non-work-related condition of spinal stenosis resulting in the surgery performed on January 3, 2000. As such, the review panel did not err in reversing the trial court's award of vocational rehabilitation services.

## CONCLUSION

For the reasons stated, we conclude that the order of the Workers' Compensation Court review panel, affirming in part and reversing in part the trial court's decision, should be affirmed in all respects.

AFFIRMED.