the domestic abuse theory, and she cannot now change to a harassment theory. We conclude that Linda's cross-appeal lacks merit.

## CONCLUSION

The district court incorrectly granted a domestic abuse protection order, because William's conduct did not fit within the statutory definition of "abuse" under § 42-903(1). Allowing Linda to shift to a harassment theory on appeal would violate fundamental principles of law. We reverse the judgment of the district court and remand the cause with directions to deny the requested domestic abuse protection order.

Reversed and remanded with directions.

---

Patricia M. Damme, appellee, v.
Pike Enterprises, Inc., appellant.
___ N.W.2d ___

Filed December 5, 2014.    No. S-14-304.

1. **Workers' Compensation: Appeal and Error.** A judgment, order, or award of the Workers' Compensation Court may be modified, reversed, or set aside only upon the grounds that (1) the compensation court acted without or in excess of its powers; (2) the judgment, order, or award was procured by fraud; (3) there is not sufficient competent evidence in the record to warrant the making of the order, judgment, or award; or (4) the findings of fact by the compensation court do not support the order or award.

2. **Workers' Compensation: Evidence: Appeal and Error.** In testing the sufficiency of the evidence to support the Workers' Compensation Court's findings, an appellate court considers the evidence in the light most favorable to the successful party. The appellate court resolves every controverted fact in the successful party's favor and gives that party the benefit of every inference that is reasonably deducible from the evidence.

3. **Workers' Compensation: Appeal and Error.** The Workers' Compensation Court's factual findings have the effect of a jury verdict, and an appellate court will not disturb them unless they are clearly wrong.

4. ____: ____. An appellate court independently reviews questions of law decided by a lower court.

5. **Workers' Compensation.** Whether to recognize a nonstatutory defense in a workers' compensation case presents a question of law.

6. **Workers' Compensation: Proof.** In a workers' compensation case involving a preexisting condition, the claimant must prove by a preponderance of evidence that the claimed injury or disability was caused by the claimant's employment and is not merely the progression of a condition present before the employment-related incident alleged as the cause of the disability.

7. **Workers' Compensation.** A workers' compensation claimant can recover benefits when an injury, arising out of and in the course of employment, combines with a preexisting condition to produce disability, even if no disability would have occurred absent the preexisting condition. The "lighting up" or acceleration of a preexisting condition by an accident is a compensable injury.

8. \_\_\_\_. Causation of an injury or disability presents an issue of fact.

9. **Workers' Compensation: Expert Witnesses.** Unless an injury's nature and effect are plainly apparent, a workers' compensation claimant must establish the causal relationship between the employment and the injury or disability by expert opinion.

10. \_\_\_\_: \_\_\_\_. Although a claimant's medical expert does not have to couch his or her opinion in the magic words "reasonable medical certainty" or "reasonable probability," the opinion must be sufficient to establish the crucial causal link between the claimant's injuries and the accident occurring in the course and scope of the claimant's employment.

11. **Expert Witnesses: Physicians and Surgeons: Appeal and Error.** An appellate court examines the sufficiency of a medical expert's statements from the expert's entire opinion and the record as a whole.

12. **Workers' Compensation: Expert Witnesses: Physicians and Surgeons.** The Workers' Compensation Court is the sole judge of the credibility and weight to be given medical opinions, even when the health care providers do not give live testimony.

13. \_\_\_\_: \_\_\_\_: \_\_\_\_. Resolving conflicts within a health care provider's opinion rests with the Workers' Compensation Court, as the trier of fact.

14. **Workers' Compensation: Appeal and Error.** When the record presents nothing more than conflicting medical testimony, an appellate court will not substitute its judgment for that of the Workers' Compensation Court.

15. **Workers' Compensation.** Under the Nebraska Workers' Compensation Act, both temporary and total disability benefits are awarded for diminished employability or impaired earning capacity and do not depend on a finding that the claimant cannot be placed with the same employer or a different one.

16. \_\_\_\_. The level of a worker's disability depends on the extent of diminished employability or impairment of earning capacity, and does not directly correlate to current wages.

17. **Workers' Compensation: Torts.** The Nebraska Workers' Compensation Act constitutes a compromise between the rights of employers and employees. Under the act, employees give up the right to complete compensation that they might recover under tort law in exchange for no-fault benefits that they quickly receive for most economic losses from work-related injuries.

18. **Workers' Compensation: Legislature: Public Policy.** Because the Nebraska Workers' Compensation Act reflects a legislative balancing of rights, defenses that defeat a worker's right to seek or receive disability benefits for a work-related injury are a matter of public policy that the Legislature should decide.

19. **Workers' Compensation: Prisoners: Proof.** If a workers' compensation claimant can prove a loss of earning capacity, his or her incarceration after sustaining a compensable injury is not an event that bars the claimant's receipt of disability benefits, absent a statute requiring that result.

20. **Workers' Compensation.** Total disability exists when a workers' compensation claimant is unable to earn wages in either the same or a similar kind of work he or she was trained or accustomed to perform or in any other kind of work which a person of the claimant's mentality and attainments could perform.

21. **Workers' Compensation: Testimony.** Although medical restrictions or impairment ratings are relevant in determining a claimant's disability, the Workers' Compensation Court can rely on a claimant's testimony regarding his or her own limitations to determine the extent of the claimant's disability.

Appeal from the Workers' Compensation Court: J. Michael Fitzgerald, Judge. Affirmed.

Christopher A. Sievers, of Timmermier, Gross & Prentiss, for appellant.

Elaine A. Waggoner, of Waggoner Law Office, for appellee.

Heavican, C.J., Wright, Connolly, Stephan, McCormack, Miller-Lerman, and Cassel, JJ.

Connolly, J.

### SUMMARY

This workers' compensation case presents an issue of first impression in Nebraska: whether a claimant's incarceration after sustaining a compensable injury should bar the claimant from recovering temporary total disability benefits while she is incarcerated. The appellant, Pike Enterprises, Inc. (Pike), also argues that the court erred in finding a causal connection between the appellee's alleged injury in October 2009 and her back surgery in January 2013, and in awarding future medical benefits.

We agree with the court that after a claimant sustains a compensable injury resulting in total disability, her later incarceration does not bar her receipt of benefits. The evidence sufficiently supported the court's conclusion that Pike sustained

a new injury that aggravated an existing back condition and caused her symptoms of constant pain and that her surgery in January 2013 was necessary to treat the injury. We affirm the trial court's award.

## BACKGROUND

### HISTORICAL FACTS

The appellee, Patricia M. Damme, has a history of degenerative disk disease. It started in 1995, when her lower back problems required a lumbar laminectomy (removal of the spongy material between the disks) at the L4-5 level. She also has a history of mental health issues and illicit drug use, for which she has been regularly treated by a psychiatrist.

In 2001, boxes fell on her while working on a job, injuring her back and neck. This injury required a cervical diskectomy and fusion at the C5-6 level. In a lump-sum settlement, the employer agreed to pay her for an 8-percent whole-body permanent partial disability. In 2002, she began receiving disability benefits from Social Security because of her psychiatric problems. She said she continued to work because keeping busy helped her deal with her psychiatric problems.

In January 2004, a semitrailer truck hit her vehicle. At the hospital, she reported mild tenderness in her lower quadrant. The hospital physician reported mild degenerative disk disease above and below her C5-6 fusion but no complications from the accident.

In 2006, after a fall at a store, Damme experienced increased neck pain and pain in her lower back that radiated into her left thigh. An MRI of her cervical and lumbar spine showed that the cervical fusion was intact and that her lumbar spine had some degenerative disk disease, but that the spacing between the disks was within the normal range. The physician did not recommend surgical intervention but referred her to a physical therapist.

In 2008, while working for her previous employer, she tripped and fell against a wall, experiencing neck pain. About a month later, while reaching up, she experienced severe neck pain, which improved with time but remained constant and variable in intensity. The cause of her neck and shoulder pain

was not clear, and she was referred to a physical therapist and released to return to work with some restrictions. In 2009, her physician determined that she had sustained a 5-percent impairment of her right upper extremity.

In June 2009, Damme began working for Pike, which owns a McDonald's restaurant. On October 15, she hurt her back at the restaurant while carrying bags. When she bent over to put the bags on a table, she felt a pop in her back and a searing pain. At first, she could not stand up. She said she had never experienced pain like that with any of her previous back problems. She went home to apply ice to her back and went to the hospital later that night with burning pain. The hospital physician assessed her with a likely lumbosacral sprain. She was given an anti-inflammatory shot and prescribed a muscle relaxant and pain medication.

A few days later, Damme called her nurse practitioner about severe back pain and was prescribed hydrocodone. An x ray of her lumbar spine showed mild degenerative changes and a significant loss of disk height at the L4-5 level, which was a "stark progression" compared to her 2006 x rays. An MRI of the L4-5 level showed no intervertebral disk fluid. She was referred to a surgeon who noted that she was already taking a "fairly substantial dose of narcotics" and referred her to a pain consultant before investigating whether to perform surgery. On November 4, 2009, the pain consultant assessed Damme as having a herniated disk, multilevel degenerative disk disease in her lumbosacral spine, and lumbar back pain. He prescribed OxyContin for pain and physical therapy. On November 29, her primary care physician continued the OxyContin prescription for pain. On December 8, Damme returned to the pain consultant because her back pain was worse and radiating into her left buttock and thigh.

At some point, a managed care organization referred Damme to James Mayer, M.D., for a second opinion regarding her treatment. Mayer wrote a report on December 1, 2009, after examining Damme and her treatment history. In response to questions from the referring organization, Mayer reported that to the best of his medical knowledge, Damme's October 15 injury aggravated her degenerative joint disease of the spine

and that her employment was a contributing cause of her symptoms. He believed that the aggravation was temporary but that she had not yet reached maximum medical improvement. He stated that it was too early to determine whether she had sustained any permanent impairment. He also expressed concerns about the amount of narcotics she was taking and did not want to manage her care because of her "psychosocial issues" and previous history of illicit drug use. He recommended physical therapy and tapering her off narcotics.

In January 2010, the surgeon saw Damme again. He discussed his concerns about an operative fusion, but he believed a diskogram might help him to determine the source of her pain. On January 18, a different physician reviewed the surgeon's records. He believed that a lumbar fusion was a possible treatment based on the MRI results. But he first referred Damme to another physician for an assessment of nonsurgical treatments. In April, that physician recommended facet blocks, which are injections of medications that numb pain in the vertebral joints. But a facet block did not relieve Damme's pain.

In February 2010, her primary care physician dismissed her from his care because he believed she was selling her narcotic medications. She continued to see a psychiatrist. In March, she was seen by a different physician who noted that because of her low pain threshold and psychiatric problems, locating the source of her pain and treating her with injections would be difficult. He noted that these same problems, coupled with her smoking, made the outcome of a surgery unpredictable. He said he would recommend surgery only if all her previous health care providers agreed surgery was reasonable.

In May 2010, Pike had Damme examined by Michael O'Neil, M.D. O'Neil reviewed her medical records and reported to Pike's attorney that "it is more probable than not (with reasonable medical certainty) that . . . Damme did sustain an exacerbation or a temporary worsening of preexisting symptomatic degenerative lumbar disc disease at L4-L5." But he could not separate what portion of her current low-back pain was the result of the October 15, 2009, injury from the natural progression of the disease. He did not believe she had

any permanent impairment resulting solely from the injury. He stated that ordinarily, she would be a good candidate for fusion surgery. But like her other physicians, he was reluctant to recommend surgery because of her psychiatric problems and use of narcotics.

In August 2010, however, O'Neil revised his opinion. He again opined that Damme's work-related injury resulted in an exacerbation or temporary worsening of her disk disease. But he now believed it was more probable than not that her preexisting conditions had caused her pain and not a minor incident at work. He further opined that she needed narcotic medications because of her drug dependency and not because of her alleged back injury. He concluded that Damme had reached maximum medical improvement on October 15, 2009, the date of her injury.

In January 2011, Damme was arrested for unspecified reasons. She stated that she stopped taking her psychiatric medications because of the opiates she was taking, which caused her to get into trouble. She was committed to the Lincoln Regional Center for 6 months because she was not competent to stand trial. After that, she was incarcerated from June 17 to December 28, 2011. After she was released, she went to a new physician for pain management, who referred her to a new surgeon.

In July 2012, the new surgeon, H.R. Woodward, M.D., examined Damme. Woodward noted that since Damme's work injury, she had reported experiencing constant low-back pain that intermittently radiated down her left leg to her knee. He noted that her October 2009 x rays had shown nearly a complete loss of disk space at the L4-5 level. Woodward stated that Damme had "an obvious pathology at the L4-5 disc that is in all likelihood causing her present symptoms." He noted that a diskogram performed in November 2010 had shown a markedly abnormal L4-5 disk with concordant pain. He concluded that nonsurgical treatments had been unsuccessful and recommended a spinal fusion. He told Damme that he would perform the surgery if she completely stopped smoking and reduced her narcotic use.

Woodward performed the surgery in January 2013, which was a success. Within 2 months, her leg pain was completely gone, and within 3 months, her back pain was minimal and occasional. In June, Damme reported that she had no pain. She testified that her back felt as good as it had before the October 2009 injury. On June 17, 2013, Woodward released her to work without restrictions, which date the court interpreted to be when Damme reached maximum medical improvement.

## Court's Order

In its order, the court found that there was "no question that [Damme] injured her low back in the accident on October 15, 2009." The court noted that before Damme's 2009 injury, she was treated many times for her back problems but that except for one notation when she was treated in June 2006 for pain after falling, no physicians had reported prescribing her narcotic pain medications. The court implicitly found that she consistently needed such medications only after the 2009 injury and noted that the fusion surgery was a success. It extensively reviewed her medical records and concluded that all the surgeons who had examined Damme believed surgery would have been a reasonable treatment except for her psychiatric problems and use of narcotics.

Additionally, the court implicitly found that Pike delayed Damme's surgery by stopping her medical benefits after O'Neil's examination, stating that Pike "denied medical care after the examination by Dr. O'Neil. [Damme] was unable to obtain additional medical care until May of 2012 which ultimately led to a referral . . . to Dr. Woodward." The court determined that the record as a whole was sufficient to show that Damme's January 2013 surgery was reasonable and necessary to treat her 2009 injury.

The court awarded Damme temporary total disability benefits from November 9, 2009, through June 17, 2013, and future medical care as required by Neb. Rev. Stat. § 48-120 (Cum. Supp. 2014). It denied Damme's claim for penalties and credited Pike for the payments it had made to Damme. It

rejected Pike's argument that Damme could not receive benefits during her incarceration.

## ASSIGNMENTS OF ERROR

Pike assigns that the court erred in (1) finding a causal relationship between the October 2009 "incident" and the January 2013 surgery, (2) not considering whether the January 2013 surgery was fair and reasonably necessary to treat Damme, (3) awarding temporary total disability benefits, and (4) awarding nonspecified future medical benefits.

## STANDARD OF REVIEW

[1] A judgment, order, or award of the Workers' Compensation Court may be modified, reversed, or set aside only upon the grounds that (1) the compensation court acted without or in excess of its powers; (2) the judgment, order, or award was procured by fraud; (3) there is not sufficient competent evidence in the record to warrant the making of the order, judgment, or award; or (4) the findings of fact by the compensation court do not support the order or award.[1]

[2-5] In testing the sufficiency of the evidence to support the Workers' Compensation Court's findings, we consider the evidence in the light most favorable to the successful party. We resolve every controverted fact in the successful party's favor and give that party the benefit of every inference that is reasonably deducible from the evidence.[2] The court's factual findings have the effect of a jury verdict, and we will not disturb them unless they are clearly wrong.[3] But we independently review questions of law decided by a lower court.[4] Whether to recognize a nonstatutory defense in a workers' compensation case presents a question of law.[5]

---

[1] *Potter v. McCulla*, 288 Neb. 741, 851 N.W.2d 94 (2014).

[2] See *Pearson v. Archer-Daniels-Midland Milling Co.*, 285 Neb. 568, 828 N.W.2d 154 (2013).

[3] See *Moyera v. Quality Pork Internat.*, 284 Neb. 963, 825 N.W.2d 409 (2013).

[4] *Id.*

[5] See *Bassinger v. Nebraska Heart Hosp.*, 282 Neb. 835, 806 N.W.2d 395 (2011).

## ANALYSIS

### Causation

Pike argues that the record shows the October 2009 "incident" was not an injury but a "temporary symptom aggravation" of Damme's preexisting back problems.[6] It contends that the court erred in finding that Damme sustained a work-related injury because she failed to present a medical expert's opinion establishing that the work-related event caused her injury. Alternatively, Pike contends that the court erred in failing to consider whether its evidence overcame the presumption that the treatment was reasonable. It argues that Damme obtained the surgery in an effort to obtain more narcotic prescriptions. It points out that she obtained such a prescription after her surgery and that before Woodward agreed to perform the surgery, other physicians had refused to do so because of her use of narcotics.

Damme argues that when their statements are read in context, Mayer and O'Neil both concluded that Damme had sustained an exacerbation of her preexisting degenerative disk disease on October 15, 2009, at the L4-5 level of her lumbar spine. And she argues that their opinions are sufficient to show she sustained a work-related injury to her back and that Woodward's notes are sufficient to show the surgery was necessary to treat her condition. We agree.

[6-8] In a workers' compensation case involving a preexisting condition, the claimant must prove by a preponderance of evidence that the claimed injury or disability was caused by the claimant's employment and is not merely the progression of a condition present before the employment-related incident alleged as the cause of the disability.[7] A workers' compensation claimant can recover benefits when an injury, arising out of and in the course of employment, combines with a preexisting condition to produce disability, even if no disability would have occurred absent the preexisting condition. The "'lighting

---

[6] Brief for appellant at 8.

[7] *Swanson v. Park Place Automotive*, 267 Neb. 133, 672 N.W.2d 405 (2003).

up'"" or acceleration of a preexisting condition by an accident is a compensable injury.[8] And causation of an injury or disability presents an issue of fact.[9]

[9-11] Unless an injury's nature and effect are plainly apparent, a workers' compensation claimant must establish the causal relationship between the employment and the injury or disability by expert opinion.[10] Although a claimant's medical expert does not have to couch his or her opinion in the magic words "reasonable medical certainty" or "reasonable probability," the opinion must be sufficient to establish the crucial causal link between the claimant's injuries and the accident occurring in the course and scope of the claimant's employment.[11] We examine the sufficiency of a medical expert's statements from the expert's entire opinion and the record as a whole.[12]

Here, both Mayer and O'Neil reported that on October 15, 2009, Damme sustained an exacerbation of a preexisting degenerative disk disease at the L4-5 level of her lumbar spine. These statements are consistent with the surgeon's findings soon after the injury that Damme's x rays showed a marked loss of disk space at the L4-5 level. Mayer explicitly stated that her employment was a contributing cause of her symptoms. O'Neil reviewed Damme's medical records and reported to Pike's attorney that "it is more probable than not (with reasonable medical certainty) that . . . Damme did sustain an exacerbation or a temporary worsening of preexisting symptomatic degenerative lumbar disc disease at L4-L5."

[12-14] O'Neil confirmed this opinion even when he later opined that Damme's pain was probably the result of her preexisting back condition and not the October 2009 "incident." And as we know, the Workers' Compensation Court is the

---

[8]  *Id.* at 139, 672 N.W.2d at 412.

[9]  See *Potter, supra* note 1.

[10]  See *id.*

[11]  See *Owen v. American Hydraulics*, 258 Neb. 881, 606 N.W.2d 470 (2000).

[12]  *Frank v. A & L Insulation*, 256 Neb. 898, 594 N.W.2d 586 (1999), citing *Miner v. Robertson Home Furnishing*, 239 Neb. 525, 476 N.W.2d 854 (1991).

sole judge of the credibility and weight to be given medical opinions, even when the health care providers do not give live testimony. Resolving conflicts within a health care provider's opinion also rests with the court, as the trier of fact.[13] When the record presents nothing more than conflicting medical testimony, an appellate court will not substitute its judgment for that of the compensation court.[14]

In his original opinion, O'Neil reported that he could not determine how much of Damme's symptoms could be attributed to the October 2009 injury. But a claimant is not required to prove an apportionment of symptoms to an accident if the evidence shows that the accident is a contributing cause of the injury: "'The law does not weigh the relative importance of the two causes, nor does it look for primary and secondary causes; it merely inquires whether the employment was a contributing factor. If it was, the concurrence of the personal cause will not defeat compensability.'"[15]

It is true that both Mayer and O'Neil believed that Damme's exacerbation was temporary, but Mayer also stated that Damme had not yet reached maximum medical improvement. And the record shows that Damme's medical providers could not successfully treat her constant pain symptoms without surgical intervention, because her indefinite reliance on narcotic pain medications was not a reasonable treatment plan. Damme's dependence on pain medications was the reason that a new physician referred her to Woodward in 2012 to consider surgery. And the record shows that nonsurgical treatment had been unsuccessful. In reviewing her medical records, Woodward specifically noted that after the 2009 injury, Damme's diskogram showed nearly a complete loss of disk space at the L4-5 level. He stated that she had "an obvious pathology at the L4-5 disc that is in all likelihood causing her present symptoms." He noted a markedly abnormal L4-5

---

[13] See, *Swanson, supra* note 7; *Frank, supra* note 12.

[14] *Id*.

[15] *Cox v. Fagen Inc*., 249 Neb. 677, 683, 545 N.W.2d 80, 85 (1996). Accord 1 Arthur Larson & Lex K. Larson, Larson's Workers' Compensation Law § 4.04 (2014).

disk with concordant pain and concluded that nonsurgical treatments had been unsuccessful and that surgery was indicated. These conclusions were sufficient to link the necessity of Damme's surgery to the marked deterioration of her lumbar disk spacing that physicians noted soon after her injury.

Finally, Pike incorrectly argues that the court failed to consider whether Damme's surgery resulted from her attempts to obtain prescriptions for narcotic pain medications. The court implicitly rejected this argument. And the evidence of her post-surgery recovery supports that determination. We conclude the court was not clearly wrong in finding that Damme had shown she sustained a work-related injury that was a contributing factor to her back injury and pain symptoms. It also was not clearly wrong in finding that the January 2013 surgery was a reasonable and necessary treatment.

## Temporary Total Disability
### Benefits

Pike contends that the court erred in awarding Damme "healing benefits" from the time she was injured until Woodward released her to return to work. Pike argues that she had no record of work restrictions after December 2009 and that she was not entitled to benefits during her incarceration. It argues that the purpose of benefits during a healing period is to replace the claimant's wages.

Damme contends that the question is whether she sustained a loss of earning power, which is a question of fact that the court properly resolved. She testified that she unsuccessfully tried to obtain employment with Pike and other employers and that the reasonable inference from this evidence is that she could not obtain employment in any field for which she was suited. She further argues that the majority of courts have held a subsequent incarceration does not affect a claimant's eligibility for workers' compensation benefits absent a statute to the contrary. We agree.

[15] First, we clarify that no workers' compensation statute provides a defense to paying disability benefits because a claimant is incarcerated. And we reject Pike's argument

that temporary disability benefits are intended to replace a claimant's wages while they are healing from an injury. It is true that a court awards temporary disability benefits for the period during which the employee cannot work because he or she is submitting to treatment, convalescing, or suffering from the injury.[16] But under the Nebraska Workers' Compensation Act, both temporary and permanent disability benefits are awarded for diminished employability or impaired earning capacity and do not depend on a finding that the claimant cannot be placed with the same employer or a different one:

> [A] compensation court must generally determine only two issues: (1) that the employee can no longer earn wages doing the same kind of work for which he or she was trained or accustomed to performing and (2) that the employee lacks the skills needed to perform other work that is within the employee's physical limitations and for which a stable market exists. . . . [V]ocational specialists can assess an employee's loss of earning power by determining the type of work the employee would have been qualified to do before the injury and eliminating those occupations that are incompatible with the employee's postinjury restrictions. The specialist can then use market surveys to determine the employee's loss of access to jobs in a labor market based on the employee's postinjury physical restrictions and vocational impediments.[17]

[16] In short, the level of a worker's disability depends on the extent of diminished employability or impairment of earning capacity, and does not directly correlate to current wages.[18] Although showing reduced wages and shortened work hours can support a finding of diminished earning capacity, the claimant can also prove disability through impairment ratings

---

[16] See *Zwiener v. Becton Dickinson-East*, 285 Neb. 735, 829 N.W.2d 113 (2013).

[17] *Moyera*, *supra* note 3, 284 Neb. at 976, 825 N.W.2d at 419.

[18] *Zwiener, supra* note 16.

and the claimant's lost access to jobs based on his or her physical restrictions and vocational impediments.[19]

For this reason, we have held that an alien's illegal work status does not preclude the worker from receiving permanent disability benefits. In *Moyera v. Quality Pork Internat.*,[20] we rejected an argument that permanent total disability benefits should be barred for illegal aliens because such claimants cannot legally work in the United States. Because total disability benefits do not depend on a claimant's ability to accept employment, we held that the claimant's illegal status did not bar an award of indemnity for permanent total loss of earning capacity.[21] The same reasoning applies to an award of temporary total disability benefits.[22]

[17,18] Equally important, we have explained that the Nebraska Workers' Compensation Act constitutes a compromise between the rights of employers and employees. Under the act, employees give up the right to complete compensation that they might recover under tort law in exchange for no-fault benefits that they quickly receive for most economic losses from work-related injuries.[23] This loss of remedies is why we broadly construe the act to accomplish its beneficent purpose and why we overruled an earlier case in which we had adopted a common-law misrepresentation defense.[24] That is, because the act reflects a legislative balancing of rights, defenses that defeat a worker's right to seek or receive disability benefits for a work-related injury are a matter of public policy that the Legislature should decide.[25]

---

[19] See *Frauendorfer v. Lindsay Mfg. Co.*, 263 Neb. 237, 639 N.W.2d 125 (2002), citing *Cords v. City of Lincoln*, 249 Neb. 748, 545 N.W.2d 112 (1996).

[20] *Moyera, supra* note 3.

[21] See *id.*

[22] See *id.*, citing *Visoso v. Cargill Meat Solutions*, 18 Neb. App. 202, 778 N.W.2d 504 (2009).

[23] *Id.*

[24] See *Bassinger, supra* note 5.

[25] See *id.* (overruling *Hilt Truck Lines, Inc. v. Jones*, 204 Neb. 115, 281 N.W.2d 399 (1979)).

In sum, under Nebraska's workers' compensation statutes, an award of disability benefits does not depend upon the claimant's ability to prove he or she has lost wages because of a work-related injury. And our previous refusal to recognize a nonstatutory defense is consistent with what the majority of courts have held in considering whether incarceration bars disability benefits.[26] Workers' compensation benefits are controlled by statute. Thus far, the act does not disqualify persons who are in jail or prison from receiving these benefits. The Legislature determines the content of statutes. It could amend the statute. But unless it does, this court cannot deny workers' compensation benefits to prisoners.

[19] So we hold that if a claimant can prove a loss of earning capacity, his or her incarceration after sustaining a compensable injury is not an event that bars the claimant's receipt of disability benefits, absent a statute requiring that result. The only question is whether Damme proved her diminished earning capacity.

[20,21] Total disability exists when a workers' compensation claimant is unable to earn wages in either the same or a similar kind of work he or she was trained or accustomed to perform or in any other kind of work which a person of the claimant's mentality and attainments could perform.[27] Although medical restrictions or impairment ratings are relevant in determining a claimant's disability, the Workers'

---

[26] See, *United Riggers Erectors v. Industrial Com'n*, 131 Ariz. 258, 640 P.2d 189 (Ariz. App. 1981); *Wheeler Const. Co. v. Armstrong*, 73 Ark. App. 146, 41 S.W.3d 822 (2001); *Sims v R. D. Brooks, Inc*, 389 Mich. 91, 204 N.W.2d 139 (1973); *Hardin's Bakery v. Taylor*, 631 So. 2d 201 (Miss. 1994); *SIIS v. Campbell*, 109 Nev. 997, 862 P.2d 1184 (1993); *State ex rel. OmniSource v. Indus. Comm.*, 113 Ohio St. 3d 303, 865 N.E.2d 41 (2007); *Forshee & Langley Logging v. Peckham*, 100 Or. App. 717, 788 P.2d 487 (1990); *Stevenson v. Westmoreland Coal Co., Ap.*, 146 Pa. Super. 32, 21 A.2d 468 (1941); *King v. Industrial Com'n of Utah*, 850 P.2d 1281 (Utah App. 1993), *abrogated on other grounds, Murray v. Utah Labor Com'n*, 308 P.3d 461 (Utah 2013); Annot., 54 A.L.R.4th 241 (1987); 9A Lee R. Russ & Thomas F. Segalla, Couch on Insurance 3d § 134:29 (2005). See, also, *In re MacDonnell's Case*, 82 Mass. App. 196, 971 N.E.2d 836 (2012).

[27] E.g., *Kim v. Gen-X Clothing*, 287 Neb. 927, 845 N.W.2d 265 (2014).

Compensation Court can rely on a claimant's testimony regarding his or her own limitations to determine the extent of the claimant's disability.[28]

Here, the record shows that Damme's nurse practitioner, who was her primary health care provider in October 2009, wrote work release notes for Damme at least through December 2009 and, in 2010, recommended home health care services for her. Damme said that in December 2009, she tried to return to work for Pike to keep herself "out of trouble," but she could not because of her work restrictions. She testified that she also had work release notes after December 2009, which is consistent with the nurse practitioner's recommendation of home health care. Damme testified that before her surgery in 2013, she required home health care because she had trouble toileting and doing simple household chores by herself. She said she later reapplied twice to Pike and at other places of employment, despite knowing that she could not perform the work. But she received no job offers. The record is sufficient to support the court's finding of total disability from the date of Damme's injury to the date that Woodward released her to return to work.

## CONCLUSION

We conclude that the court did not err in finding that Damme proved she sustained a work-related injury in October 2009 that was a contributing factor to her temporary total disability. Nor did the court err in determining that Damme's 2013 surgery was reasonably necessary to treat her physical condition and pain symptoms.

We conclude that evidence sufficiently supported the court's finding that after her injury, Damme could not work until June 2013, when Woodward, the surgeon who performed her spinal fusion, released her to return to work. The court correctly determined that Damme's incarceration was not an event that barred her receipt of disability benefits.

---

[28] See, *Manchester v. Drivers Mgmt.*, 278 Neb. 776, 775 N.W.2d 179 (2009), citing *Luehring v. Tibbs Constr. Co.*, 235 Neb. 883, 457 N.W.2d 815 (1990); *Frauendorfer, supra* note 19, citing *Cords, supra* note 19.

Finally, we find no merit to Pike's argument that the court erred in awarding future medical benefits to Damme.

AFFIRMED.